U.S. Court of Appeals for the First Circuit
No. 89-477

PAULINE CHRONIAK & a.

v.

GOLDEN INVESTMENT CORPORATION & a.

July 9, 1990

*Wright & Cherry*, of Henniker (*Peter S. Wright, Jr.*, on the brief and orally), for the plaintiffs.

*Kenna and Johnston*, of Manchester (*Richard F. Johnston* on the brief and orally), for the defendants.

BROCK, C.J. The United States Court of Appeals for the First Circuit (*Breyer*, C.J.) has certified to us the following questions of law, *see* SUP. CT. R. 34, concerning two loans made by the defendants, Golden Investment Corporation and its president, Armand Roberts, to the plaintiffs, Thomas Pugliese and his aunt Pauline Chroniak:

"1. Does RSA 398-A:3 apply to persons who, like defendants, are lenders but are not 'in the business of second mortgage loans?' RSA 398-A:1-a.

"2. If the answer to the first question is yes, are loans made by a corporation formed to engage in real estate investment nonetheless exempted from the requirements of RSA 398-A by RSA 398-A:10, assuming they are 'incidental to the conduct of [that] business?' RSA 398-A:10."

For the reasons stated below, we answer "yes" to both questions.

The facts of the underlying case are briefly these. In 1986, the plaintiff, Thomas Pugliese, faced criminal charges in New Hampshire and needed to raise $175,000 in order to secure his own release on bail. Seeking the assistance of a bail bondsman, Pugliese obtained a surety bond for $100,000. The bail bondsman then contacted the defendant, Armand Roberts, who arranged, through his business, Golden Investment Corporation (Golden), to lend Pugliese the additional $75,000 which he needed to post bail. Pugliese's aunt, Pauline Chroniak, co-signed a note for $75,000 dated June 3, 1986, evidencing the loan, and secured the loan by extending a mortgage to Roberts on her previously unencumbered home. The note called for biweekly interest payments of $1,384.61 until the principal was repaid, and the principal became due ninety days after the release or forfeiture of Pugliese's bail.

While out on bail and awaiting trial, Pugliese made faithful payments to the defendants under the terms of the $75,000 loan, and continued to pursue his occupation as an over-the-road trucker, transporting large boats and yachts. Eventually, however, he found it necessary to replace his boat trailer, and turned, once again, to the defendant for the funds, entering into a second loan agreement with Golden Investment Corporation on July 27, 1987, while the first loan was still outstanding. The second loan, like the first loan, was co-signed by Pugliese's aunt, Pauline Chroniak, and was secured by a second mortgage on her house. Although the face value of the note was $27,000, Pugliese contends that he received only $20,000.

The terms of the second loan called for repayment of $7,000 within ninety days of the loan date, $10,000 within 180 days of the loan date, and $1,000 interest each month thereafter until the balance was paid. The note further provided that if either of the first two required payments on principal were not made on their due dates, the interest payments called for under the agreement would automatically double to $2,000 each month until the principal was repaid.

On June 29, 1988, Pugliese repaid the entire principal on the $75,000 note. He had, by that time, paid a total of $74,768.94 in interest alone on the $75,000 note, and had paid $18,000 on the second note. Claiming that he had received only $20,000 under the second loan agreement and that he was obligated to repay only the balance due on principal, Pugliese then tendered to the defendant $2,000 in full and final payment of the second note. In response, Golden re-

jected the tender on the second loan, notified Pugliese that he was in default, and began foreclosure proceedings on the Chroniak house.

Pugliese and Chroniak then brought this action against Golden and Roberts in the United States District Court for the District of New Hampshire, claiming that both loans violated section 3 of New Hampshire's Second Mortgage Home Loans statute, RSA 398-A:3. All references in this opinion to RSA chapter 398-A are to the version of the statute in effect at the time the loans were made, Laws 1985, 397:8; Laws 1986, 92:8. Section 3 provides that a "lender shall have no right to collect interest" if "any note secured by a mortgage . . . does not . . . clearly indicate . . . the rate of interest. . . ." Laws 1986, 92:8. Pugliese and Chroniak sought to rescind the notes and recover all interest paid. They also made the notes the bases of claims under New Hampshire's Consumer Protection statute, RSA ch. 358-A, New Hampshire's Unfair, Deceptive or Unreasonable Collection Practices Act, RSA ch. 358-C, and the federal Racketeer Influenced And Corrupt Organizations Act (RICO), 18 U.S.C. § 1961 *et seq.*

The defendants moved for summary judgment, contending, *inter alia,* that RSA 398-A:3 did not apply to the two loans at issue in this case. The defendants argued that section 3 applied only to notes issued by persons who were required by section 1-a to obtain a license, and that because they had not made more than four mortgage-backed loans in any year, they were not required to obtain a license under the statute and were not subject to the effect of RSA 398-A:3.

Alternatively, the defendants argued that the loans in question fell within the statutory exemptions of RSA 398-A:10. Section 10, paragraph II, provides that "[n]othing contained in this chapter shall be deemed to have any effect on individuals or corporations who make mortgage loans incidental to the conduct or the operation of another business, such as real estate or construction." Laws 1985, 397:12. Alleging that Roberts formed Golden Investment Corporation "with the intent of investing in commercial real estate projects," the defendants claimed that Golden was "another business" within the meaning of RSA 398-A:10, and that the two loans were "incidental to the conduct" of that business, entitling Roberts and Golden to an exemption from the provisions of RSA chapter 398-A.

For these and other reasons, the district court granted summary judgment in favor of the defendants. Following an appeal by the plaintiffs to the United States Court of Appeals for the First Circuit,

the aforementioned questions of law were certified to this court by the Court of Appeals.

The threshold question being the applicability of RSA 398-A:3 to the defendants, our first concern is with the words of the statute:

"398-A:3 Effect of Failure to Specify Interest Rate. If any note secured by a mortgage, in the case of loans other than open-end loans, does not among its provisions, clearly indicate the principal sums, the rate of interest, the period of the loan and the periodic due dates, if any, of principal and interest or, in the case of open-end loans, if the note does not among its provisions clearly indicate the maximum amount of credit available, the rate of interest, the selected payment, or its manner of determination, and the related period or periods of repayment and the monthly or periodic due dates, then the lender shall have no right to collect interest."

Laws 1986, 92:8.

In order to support their claim that the defendants are "lenders" within the meaning of RSA 398-A:3, and therefore subject to its penalty provisions for failure to specify the rate of interest on a note by a mortgage, the plaintiffs rely upon the statutory definition of "lender" in RSA 398-A:1, which is quite broad, defining "lender" as "any person making a loan secured by a mortgage." *See* RSA 398-A:1. Since it is not disputed that the defendants are persons who have made loans secured by a mortgage, the plaintiffs read § 3 as regulating the type of lending in which the defendants have engaged. However, notwithstanding the facial applicability to the defendants of § 3, they challenge the apparent plainness of its meaning, urging statutory structure and evolution as an indication of legislative contemplation that a lender, within the meaning of § 3, is one who is "in the business of second mortgage loans," and hence, subject to the licensing requirements of RSA 398-A:1-a.

The defendants concede that RSA chapter 398-A was originally enacted as a usury statute, and that in its original scope, § 3 applied alike to all "lenders" within the statutory definition of that term. *See* Laws 1961, 255:1. Although mindful that the statutory definition of "lender" has been in force without lapse since the original enactment of RSA chapter 398-A, the defendants dispute the usefulness of the definition as an indication of legislative intent. Calling attention to amending legislation, and to the development of the statute, as, over the course of several legislative sessions, provisions have been adopted which require all persons who "engage in the business of

mortgage loans" to "first obtain a license," *Compare* Laws 1967, 258:3, *with* Laws 1985, 397:4, the defendants claim that subsequent legislation has transformed the act into a licensing and regulatory statute directed only at those lenders who make or negotiate "more than 4 mortgage loans in a calendar year," and who are therefore "deemed to be in the business of mortgage home loans." *Id.*

Thus, while the defendants fall within the scope of the statutory definition of "lender," and, hence, within the class of individuals that was actually mentioned in § 3, they attempt to avoid the ostensible scope of § 3 by arguing that the legislature's manifest intent, as determined from a construction of the statute as a whole and not by isolated words, is "to police the second mortgage industry," rather than occasional lenders, like themselves, who are exempt from the licensing requirements of the chapter because they do not make more than four mortgage loans in a calendar year. Accordingly, the defendants perceive an ambiguity as between statutory references to "lenders" and "licensees," giving rise to questions about statutory meaning.

It is a sufficient answer to this argument to point out that the precise meaning of the word "lender" is defined in the statute as follows:

> "Definitions. Whenever used in this chapter, the following words shall have the meanings set opposite them below:
>
> . . . .
>
> III. 'Lender,' means any person making a loan secured by a mortgage as described in this chapter and shall include any legal successor to the rights of the lender."

RSA 398-A:1. Given so explicit a statutory definition, the defendants cannot ignore the plain meaning of the term "lender," as employed in § 3, and simply infer that a different meaning should attach. The language in question, as we have seen, is as plain as it could be, and the defendants' efforts to advance a more limited construction are unavailing.

■■ Equally unavailing are the defendants' attempts to depart from the letter of § 3 by positing its conflict with legislative history. "It is well established that the words in the statute itself are the touchstone of the legislature's intention." *Greenhalge v. Town of Dunbarton,* 122 N.H. 1038, 1040, 453 A.2d 1295, 1296 (1982). It follows that "[e]ven if the [defendants] could show that some legislators had an intent that ran counter to the statutory language actually

enacted, this would not create the uncertainty of statutory meaning that is necessary to justify an inquiry beyond the words of the statute itself." *State Employees' Assoc. v. State*, 127 N.H. 565, 568, 503 A.2d 829, 832 (1986). To be sure, in any case involving the interpretation of a statute, we do not look to legislative history to modify the meaning of statutory language that is plain on its face. *Appeal of Cremin*, 131 N.H. 480, 483, 554 A.2d 1298, 1300 (1989). Consequently, we discount the defendants' reading of RSA chapter 398-A, and hold that § 3 applies to persons who, like the defendants, are lenders but are not "deemed to be in the business of mortgage home loans."

We note, moreover, that a literal construction of § 3 is fully compatible with the legislative objective behind RSA chapter 398-A, as disclosed by legislative history left by the proponents of both the original enactment and subsequent amendments. While the act was originally designed as a usury statute, *see* N.H.S. JOUR. 1007 (1961) ("this bill will go a long way in protecting those homeowners who find themselves forced to go into a second mortgage"), testimony before the Senate Judiciary Committee by the State Bank Commissioner identified the impetus for HB 166 (1967), which upon passing enacted the licensing provisions of § 1-a, as the need for a more effective mechanism to scrutinize lending practices and "to discover the charging of excess rates of interest." *See* Minutes of N.H. Senate Judiciary Committee, May 2, 1967. Indeed, to the extent that we do find legislative history bearing upon the scope of RSA chapter 398-A, as it evolved to require licensing of second mortgage loan companies, as well as other persons engaged in the business of making mortgage home loans, it furnishes no basis to conclude that the legislature intended to diminish the existing consumer protections of § 3, governing the "Effect of Failure to Specify Interest Rate." As indicated by minutes of testimony before the Senate Banking Committee at a hearing on HB 428 FN held on May 9, 1985, proponents of the 1985 amendments thought that increased regulation of the mortgage and second mortgage industries would enhance consumer protection. *See* Minutes of N.H. Senate Banking Committee, May 9, 1985 ("[o]nly loan sharks make loans without a stipulated rate of interest"). We conclude, accordingly, that a literal reading of § 3 is one that advances, rather than subverts, the legislature's intent to promote truth in lending.

It remains for us to answer the second question certified, which asks whether "loans made by a corporation formed to engage in real estate investment [are] nonetheless exempted from the require-

ments of RSA 398-A by RSA 398-A:10, assuming they are 'incidental to the conduct of [that] business?'" We again note that "in any case involving the interpretation of a statute, the starting point must be the language of the statute itself." *Dover Professional Fire Officers Assoc. v. City of Dover*, 124 N.H. 165, 169, 470 A.2d 866, 868–69 (1983) (quoting *State Employees' Ass'n of N.H. v. Bd. of Trustees*, 120 N.H. 272, 273, 415 A.2d 665, 666 (1980)). Therefore, the considerations that prompt our answer begin with the text of RSA 398-A:10, II, which reads as follows: "Nothing in this chapter shall be deemed to have any effect on individuals or corporations who make mortgage loans incidental to the conduct or the operation of another business, such as real estate or construction." *See* Laws 1985, 397:12.

 The meaning of the statutory language at issue here is not doubtful, and following the usual course of statutory analysis, we give to the words their plain meaning. *Appeal of Public Serv. Co. of N.H.*, 125 N.H. 46, 52, 480 A.2d 20, 24 (1984). We hold, accordingly, that loans made by a corporation formed to engage in real estate investment are exempt from the requirements of RSA chapter 398-A, assuming that they are "incidental" to the conduct of that business. We note that the district court judge made no findings concerning whether the loans were incidental, but we do not ignore the improbability that a loan advanced for purposes of posting bail or purchasing a boat trailer could ever be considered incidental to the business of a corporation formed to engage in real estate investment. However, we have not been asked to determine whether the defendants are entitled to the statutory exemption in this case. We emphasize instead that our opinion is no broader than the question certified and should not be taken to suggest that the loans in question were in fact made incidental to the conduct or operation of another business within the meaning of RSA 398-A:10.

*Remanded.*

THAYER and HORTON, JJ., did not sit; the others concurred.