**Pauline CHRONIAK and Thomas Pugliese, Plaintiffs, Appellees,**

v.

**GOLDEN INVESTMENT CORP. and Armand Roberts, Defendants, Appellants.**

**Thomas PUGLIESE, Plaintiff, Appellee,**

v.

**GOLDEN INVESTMENT CORP. and Armand Roberts, Defendants, Appellants.**

**Thomas PUGLIESE, Plaintiff, Appellant,**

v.

**GOLDEN INVESTMENT CORP. and Armand Roberts, Defendants, Appellees (Two Cases).**

Nos. 91–2343, 92–1121, 92–1317 and 92–1318.

United States Court of Appeals, First Circuit.

Heard July 30, 1992.

Decided Jan. 19, 1993.

---

Richard F. Johnston with whom Kenna, Johnston, Craighead & Sharkey, P.A., Manchester, NH, were on brief for appellants.

Peter S. Wright, Jr. with whom Wright & Cherry, Henniker, NH, were on brief for appellees.

Before SELYA, CYR and STAHL, Circuit Judges.

CYR, Circuit Judge.

Appellants Armand Roberts and Golden Investment Corporation challenge the district court's interpretation of three New Hampshire statutes regulating lending and debt collection practices. Appellee Thomas Pugliese cross-appeals from the district court order disallowing an award of attorney fees. We affirm the district court judgment and remand for reconsideration of the application for attorney fees.

# I

## BACKGROUND

In June 1986, Armand Roberts and Golden Investment Corporation loaned Pugliese $75,000 with which to arrange his release on bail. Pugliese and his aunt, Pauline Chroniak, cosigned a promissory note which stated the dollar amount of the interest charge ($1,384.61 biweekly), but *not the interest rate by percentage* (45% annually). The loan was secured by a first mortgage on the Chroniak residence. The loan was repaid in full by June 1988.

In July 1987, appellants loaned Pugliese an additional $20,000 to buy equipment for his trucking business. Pugliese and Chroniak executed a promissory note in the amount of $27,000, which required a payment of $7,000 within ninety days of its execution. The loan was secured by a second mortgage on the Chroniak home. In July 1988, Pugliese defaulted on the loan after making principal payments totalling $18,000. Chroniak made what she believed was a "final" $2,000 payment on the second mortgage loan shortly thereafter. Claiming that $27,000 (rather than $20,000) had

been advanced to Pugliese under the second loan, appellants demanded an additional $32,000 to discharge the second mortgage.[1] Pugliese's counsel notified appellants that both loans violated New Hampshire law, as the notes did not disclose the percentage rate of interest. Appellants promptly instituted foreclosure proceedings on the Chroniak residence.

In November 1988, Pugliese and Chroniak[2] brought a six-count complaint against Roberts and Golden Investment in New Hampshire federal district court, alleging, *inter alia*,[3] that the interest and repayment provisions in both promissory notes violated three New Hampshire statutes.

Relying on the Second Mortgage Home Loans Act, N.H.Rev.Stat.Ann. § 398–A [hereinafter: "SMHLA"], the complaint alleged that (1) appellants had forfeited their "right to collect interest" on the notes by failing to state the "rate of interest," thereby entitling plaintiffs to a "refund" of all interest payments on the $75,000 note (*i.e.*, $74,768.94) (SMHLA § 3),[4] (2) appellants' violations of SMHLA, section 3, constituted *criminal* offenses because they were "willful" (SMHLA § 7–a), and (3) appellants overstated by $7,000 the amount of the loan proceeds received by Pugliese on the second note, or included a $7,000 prepayment penalty in the second note (SMHLA § 2 (III, IV)).

Relying on the Consumer Protection Act, N.H.Rev.Stat.Ann. § 358–A [hereinafter: "CPA"], plaintiffs claimed (1) actual damages because appellants' violations of the SMHLA constituted "unfair or deceptive act[s] or [trade] practice[s]" (CPA § 2), and

---

**1.** Because Pugliese made his initial loan payment after the specified due date, the note provided that interest would thereafter accumulate at the rate of $2,000 per month. By October 1988, as a result of this rapid acceleration in interest accrual, appellants made claim to an outstanding principal balance of $16,000, accrued interest of $15,000, and legal fees of $1,000.

**2.** In December 1988, the foreclosure proceedings against the Chroniak residence were suspended pending resolution of the present litigation. In October 1991, Chroniak settled her claim against appellants.

**3.** The original complaint alleged violations of the Racketeer Influenced and Corrupt Organizations statute. *See* 18 U.S.C. § 1962(c). The RICO claims were dismissed and form no part of the present appeal.

**4.** The complaint did not demand reimbursement of the interest paid on the $27,000 note but merely a declaration that the note had been satisfied by plaintiffs' payments totalling $20,000 in principal, an issue which the jury resolved adversely to appellants.

(2) double or treble damages because appellants' violation of section 2 of the CPA was "willful or knowing" (CPA § 10).

Finally, relying on the Unfair Collection Practices Act, N.H.Rev.Stat.Ann. § 358–C [hereinafter: "UCPA"], plaintiffs claimed that (1) appellants qualified both as "debt collectors" (UCPA § 1) and "creditors" engaged in "consumer credit transactions" in the "ordinary course of business," (2) appellants attempted to collect interest on the $75,000 note[5] "in an unfair, deceptive, or unreasonable manner," as the interest charges were not "expressly authorized" by the loan agreement, hence were not "legally chargeable" to the plaintiffs (UCPA §§ 2 & 3), and (3) appellants' violation of the UCPA simultaneously violated CPA, section 2, which authorizes awards of double or treble damages (UCPA § 4(IV)).

Appellants initially were granted summary judgment on the ground that the SMHLA, whose violation formed the bases for liability under the CPA and the UCPA, exempted appellants from all liability because (1) Roberts was not licensed under the SMHLA to conduct "the business of [providing] second mortgage loans," and (2) both loans were "incidental" to Roberts' real estate investment business. On appeal, these questions were certified to the New Hampshire Supreme Court, which determined that the SMHLA applies both to licensed lenders *and* to "any person making a loan secured by a mortgage." *Chroniak v. Golden Inv. Corp.*, 133 N.H. 346, 349–50, 577 A.2d 1209, 1212–13 (1990). Acknowledging that loans "incidental" to a real estate investment business would be exempt under the SMHLA, the New Hampshire Supreme Court noted the "improbability that a loan advanced for purposes of posting bail or purchasing a boat trailer could ever be considered incidental to the [real estate investment] business." *Id.* at 352, 577 A.2d at 1214. Thereafter, the summary judgment was vacated on appeal and the case was remanded for trial.

In its final charge to the jury, the district court read *verbatim excerpts* from the three New Hampshire statutes. The jury ultimately responded in the following manner to the special verdict form and a special interrogatory:

1. The loans extended by Golden Investment Corporation to Thomas Pugliese were *incidental* to the conduct or the operation of the business of Golden Investment Corporation. (Question 1)
2. Roberts knew that the $75,000 and $27,000 notes failed to disclose the "rate of interest." (Questions 2, 3)
3. The $75,000 and $27,000 loan transactions were not "strictly private" in nature and were undertaken in the "ordinary course of a trade or business." (Questions 4, 5)
4. Pugliese incurred $20,000 in damages. (Question 6)
5. Pugliese received only $20,000 in the course of the loan transaction evidenced by the $27,000 promissory note signed July 27, 1987. (Special Interrogatory)

On October 24, 1991, the district court entered judgment for Pugliese in the amount of $20,000, rejecting Pugliese's request for an award of attorney fees.

## II

## DISCUSSION

### A. The Roberts and Golden Investment Appeal[6]

#### 1. *"Technical" Violation of SMHLA, Section 3*

The jury was instructed on five substantive statutory provisions (SMHLA, §§ 2 &

---

5. Unlike the first note ($75,000), which arguably was advanced for "personal" purposes (*i.e.,* bail), *see* UCPA § 1 (defining "consumer"), the $27,000 note evidenced a business loan not actionable under the UCPA as a "consumer credit transaction."

6. Although it is undisputed that the jury found that Pugliese sustained monetary damages as a consequence of appellants' "knowing" failure to disclose the rate of interest in the promissory notes, three factors hamper our review of appellants' various challenges to the jury instructions. First, the district court read *verbatim excerpts* from the three New Hampshire statutes, but during its deliberations the jury apparently was provided with *unexcerpted* photocopies of the statutes, including extraneous, uninstructed por-

3, *see infra* pp. 8, 10–11; CPA, § 2, *see infra* p. 12; and UCPA §§ 2 & 3). Appellants concede that the verdicts may have been based on their failure to state the rate of interest in the promissory notes, which constituted a predicate violation of both the CPA and the UCPA. On the other hand, appellants argue that the jury simply may have bypassed consideration of the CPA and the UCPA altogether, instead basing its award *solely* on appellants' direct "technical" violation of the disclosure requirements in SMHLA, section 3:

> If any note secured by a second mortgage and any such mortgage, in the case of loans other than open-end loans, does not, among its provisions, *specify as separate items* the principal sums, *the rate of interest,* the period of the loan and the periodic due dates, if any, of principal and interest ... *then the lender shall have no right to collect interest.*

(Emphasis added.) Appellants further argue that the plain language of section 3 merely affords the borrower an affirmative *defense* in any action initiated by the lender to collect interest on the note, and unlike other sections of the SMHLA (*e.g.,* §§ 2 & 7), affords the borrower no affirmative right to recover interest paid to the lender.[7]

The procedural peregrinations of the present claim almost daunt description. Appellants raised the claim initially in their motion for summary judgment, *see supra* note 5, but the district court granted summary judgment on an alternate ground. On appeal, the summary judgment was vacated. Following remand, appellants re-

newed their motion for summary judgment. Pugliese opposed summary judgment on the ground that a *criminal* ("willful") violation of SMHLA, section 3, would give rise to a common-law cause of action for restitution of the interest paid on the illegal loan. Prior to trial, the district court purportedly granted appellants' motion to dismiss the "common law" claims based on SMHLA, section 3. Thus, the jury was given no instruction on any "common law" claims based on SMHLA, section 3.

Normally, this would end our inquiry. As previously suggested, however, two factors aligned to configure a correct jury instruction on the applicable law. In the course of defining the predicate conduct that could serve as an "unfair or deceptive" trade practice under the CPA and the UCPA, sections 2 and 3 of the SMHLA were read, *verbatim*, to the jury. But the court *did not instruct the jury that it could not return a verdict based exclusively on the provisions of SMHLA, section 3.* Moreover, the court later denied Pugliese's request for attorney fees because it could not discern whether the jury had premised its verdict *exclusively* on SMHLA, section 3, the only one of the three statutes presented to the jury which does not authorize fee shifting. *See infra* pt. II.B.

■ We agree with the district court that no mere "technical" violation of SMHLA, section 3, could give rise to a *common-law* cause of action for restitution.[8] Nevertheless, we conclude that the

---

**7.** We reject appellants' contention that the complaint did not allege that SMHLA, § 3, created an independent cause of action for rescission of the loan agreement and refund of the interest payments. Count one alleged that the $75,000 note was "illegal" and "[p]laintiffs are entitled to have all interest payments refunded...."

**8.** Pugliese based this *implied* private cause of action on *Karamanou v. H.V. Greene Co.,* 80 N.H. 420, 423, 124 A. 373, 375 (1922), which held that a person who sustains damages under a prohibited contractual provision may, "after the transaction is finished and completed [,] .. bring [an] action and defeat the contract." (Citation omitted). In *Karamanou* and its progeny, however, the defendants committed *criminal* violations of statutes designed to protect the

---

tions. Second, the jury received little guidance as to whether (or how) the three statutes might be interrelated. Finally, the special verdict form did not require the jury to indicate the statutory provision on which its award was based. Consequently, we must scrutinize the statutes, the jury charge, and the special verdict form to ensure that the jury verdicts were not predicated on any impermissible basis, including an incorrect application of the statutory law. *Brown v. Trustees of Boston Univ.,* 891 F.2d 337, 353 (1st Cir.1989) (" 'Our principal focus in reviewing jury instructions is to determine whether they tended to confuse or mislead the jury on the controlling issues.' ") (quoting *Service Merchandise Co. v. Boyd Corp.,* 722 F.2d 945, 950 (1st Cir.1983)), *cert. denied,* 496 U.S. 937, 110 S.Ct. 3217, 110 L.Ed.2d 664 (1990).

SMHLA, holistically construed, creates a *statutory* cause of action for so-called "technical" violations of section 3. First, a jury determination that Roberts violated SMHLA, section 3, necessarily would entail a concomitant violation of SMHLA, section 2 (also read to the jury), which states in pertinent part:

> The allowable *rate of interest computed* on the unpaid balance that any person may directly or indirectly charge, take *or receive* for a second mortgage loan secured by property which is occupied in whole or part at the time said loan is made as a home by any obligor on the mortgage debt or by any person granting or releasing any interest under said mortgage shall be the *rate agreed upon in the note* between the borrower and lender, and following the sixth month of any period in which a loan has been in continuous default not more than 1½ percent per month [18% annual] on any unpaid balances.

(Emphasis added.) The synergism between sections 2 and 3 of the SMHLA derives from their shared use of the term "rate of interest." Under section 2, a lender may not compute (hence, may not *receive*) interest at a "rate" not "agreed upon in the note." Thus, a covered lender's receipt of interest charges based on a note which discloses no rate of interest violates *both* sections 2 and 3. Furthermore, SMHLA, section 7, provides in pertinent part:

---

plaintiffs. Pugliese pursued no such allegation, nor did he make it the subject of a special interrogatory. *See infra* note 17.

**9.** We ascribe no controlling significance to the jury's failure to award Pugliese the entire amount of interest paid on the $75,000 note. A lender who commits a "technical" violation of a credit disclosure statute may be entitled to set off the reasonable value of the goods or money advanced while in the possession of the buyer or borrower. *See, e.g., General Motors Acceptance Corp. v. Kyle,* 54 Cal.2d 101, 4 Cal.Rptr. 496, 502, 351 P.2d 768, 774 (1960).

**10.** Appellants argue that a "technical" violation of a lending disclosure statute should not invariably result in the voidance of a loan contract or in the borrower's right to recover the interest paid on the note. *Cf. DeCato Bros., Inc. v.*

---

Any loan made *in violation of [section] 398–A:2* by any person shall be discharged upon payment or tender by the debtor or any person succeeding to his interest in such real estate of the principal sum actually borrowed. The superior court shall have jurisdiction of all *suits arising under RSA 398–A:2* and if a finding is made that such loan secured by any such mortgage violates said section such *borrower* shall be entitled as part of his costs to a *reasonable fee for the services of his attorney* in such suit.

(Emphasis added.) Accordingly, as the New Hampshire Legislature inarguably afforded borrowers a right of action for restitution of the interest paid in excess of the interest "agreed upon in the note,"[9] SMHLA, § 2, even a jury verdict based exclusively on a so-called "technical" failure to disclose the rate of interest would comport with the applicable New Hampshire law as instructed by the district court.[10]

### 2. *"Unfair or Deceptive Act or Practice" Under CPA, Section 2*

Appellants contend that it was reversible error to instruct the jury that the mere omission of the rate of interest from the notes would constitute an "unfair or deceptive act or practice in the conduct of any trade or business" within the meaning of CPA, section 2, which provides, in pertinent part:

---

*Westinghouse Credit Corp.,* 129 N.H. 504, 529 A.2d 952 (1987) (analogous case under § 399–B); *First Fed. Sav. & Loan Ass'n v. Le Clair,* 109 N.H. 339, 253 A.2d 46 (1969) (same); *American Home Improvement, Inc. v. MacIver,* 105 N.H. 435, 201 A.2d 886 (1964) (same). Unlike the SMHLA, however, § 339–B explicitly provides only *one* statutory remedy—criminal penalties. In *DeCato,* for example, the court addressed the limited question "whether a consequence [*i.e.,* restitution of an undisclosed prepayment remedy] *beyond the one prescribed by the statute* [*i.e.,* criminal penalties for the lender] should attach [to the violation]." *DeCato,* 129 N.H. at 509, 529 A.2d at 955. These cases form no basis for the proposition that a "technical" violation of the SMHLA could not support a jury verdict depriving appellants of the benefit of their bargain (*i.e.,* the undisclosed interest), a remedy explicitly authorized in SMHLA, § 7.

It shall be unlawful for any person to use any *unfair method of competition or any unfair or deceptive act or practice* in the conduct of any *trade or commerce* within this state. Such unfair method of competition or unfair or deceptive act or practice shall include, but is not limited to, the following [list of thirteen acts]. . . .

(Emphasis added.) Appellants argue that: (1) the New Hampshire Legislature has amended several other consumer protection statutes so as to make their violation a simultaneous violation of the CPA, section 2, while prior SMHLA amendments contain no similar cross-referencing provision, and (2) the evidence adduced at trial was insufficient to entitle Pugliese to such an instruction, since the jury reasonably could not have inferred that he was treated unfairly or otherwise deceived by appellants' omissions.

The current version of section 2 lists thirteen unfair or deceptive acts or practices, but the listing is expressly made nonexhaustive. Although the statute provides no further explication and New Hampshire caselaw is sparse, consultation with both federal and Massachusetts precedent is encouraged.[11]

"[W]hether a party has committed an unfair or deceptive act, within the meaning of [the consumer protection act], is a *question of fact.*" *Brennan v. Carvel Corp.,* 929 F.2d 801, 813 (1st Cir.1991) (citing *USM Corp. v. Arthur D. Little Sys., Inc.,* 28 Mass.App.Ct. 108, 124, 546 N.E.2d 888, 897 (1989)) (emphasis added); *see also Pan American World Airways, Inc. v. United States,* 371 U.S. 296, 306–07, 83 S.Ct. 476, 482–83, 9 L.Ed.2d 325 (1963) (meaning of Federal Trade Commission Act term "unfair" must be left to case-by-case determination). A practice is "unfair" if (1) it is "within at least the *penumbra* of some common-law, statutory, *or other estab-*

*lished concept of unfairness,*" (2) "it is immoral, unethical, oppressive, or unscrupulous," or (3) "it causes substantial injury to consumers." *Rizzuto v. Joy Mfg. Co.,* 834 F.2d 7, 8 (1st Cir.1987) (quoting *Purity Supreme, Inc. v. Attorney General,* 380 Mass. 762, 777, 407 N.E.2d 297, 301 (1980)); *see also In re Pfizer, Inc.,* 81 F.T.C. 23, 61 (1972) (same standard under Federal Trade Commission Act). "A practice may be 'deceptive' . . . if it 'could reasonably be found to have caused a person to act differently from the way he otherwise would have acted.'" *Kazmaier v. Wooten,* 761 F.2d 46, 51 (1st Cir.1985) (quoting *Purity Supreme,* 380 Mass. at 777, 407 N.E.2d at 301). The CPA is a "comprehensive statute designed to regulate business practices for consumer protection," and its terms should be "broadly applied." *Gilmore v. Bradgate Assocs., Inc.,* 135 N.H. 234, 235, 604 A.2d 555, 557 (1992) (citation omitted); *see also Nei v. Burley,* 388 Mass. 307, 313, 446 N.E.2d 674, 678 (1983) ("Legislature intended the terms 'unfair and deceptive' to grow and change with the times.").

▮ Given these expansive premises, appellants' arguments fail. First, even if a technical violation of SMHLA, section 3, would not afford Pugliese an independent right of recovery, a proposition we reject, the factfinder nonetheless would have been free to find that appellants' conduct came within the "penumbra" of a statute (*i.e.,* SMHLA) designed to protect consumers from "unfair" lending practices, and that appellants' failure to disclose the rate of interest in the two notes went against established concepts of fairness upon which SMHLA is premised. *See, e.g., Schubach v. Household Fin. Corp.,* 375 Mass. 133, 137, 376 N.E.2d 140, 142 (1978) (though the illegality of the challenged conduct is a relevant inquiry, even a lawful practice may be unfair or deceptive in some circumstances); *PMP Assocs. Inc. v. Globe News-*

---

11. *The CPA itself provides that courts should* "be guided by the interpretation and construction given Section 5(a)(1) of the Federal Trade Commission Act (15 U.S.C. 45(a)(1)), by the Federal Trade Commission and the federal courts." N.H.Rev.Stat.Ann. § 358–A:13. The New Hampshire courts have invited interpretive compari-

sons with the "well developed" caselaw construing the analogous Massachusetts "unfair and deceptive practices" act, Mass.Gen.Laws ch. 93A. *See Chase v. Dorais,* 122 N.H. 600, 602, 448 A.2d 390, 391–92 (1982) (applying Massachusetts courts' definition of statutory term "trade and commerce").

*paper Co.*, 366 Mass. 593, 595, 321 N.E.2d 915, 917 (1975) (common law violation need not be shown under FTCA); *Commonwealth v. DeCotis*, 366 Mass. 234, 241, 316 N.E.2d 748, 754 (1974) ("unfair" acts under FTCA not limited to practices forbidden at common law or by criminal statute).[12] If conduct that is not proscribed by any statute may be found "unfair" under CPA, section 2, conduct squarely within the proscriptive penumbra of a consumer protection statute surely satisfies the "unfairness" requirement.

Second, the jury had ample evidence from which to determine that appellants' failure to disclose the rate of interest was a "deceptive" practice under CPA, section 2. In 1981, when New Hampshire largely deregulated the mortgage loan industry and eliminated the usury laws applicable to these transactions, *see, e.g.*, N.H.Rev.Stat. § 218.1, these "full disclosure" statutes took on increased significance as consumer protection provisions. Although disclosure of the dollar amount of interest charged would no doubt put many borrowers on notice of the rate of interest, the statute presumes that it will be difficult for the average borrower to calculate the percentage rate from the dollar figures; accordingly, the statute places the burden on the lender to express the rate of interest. *Cf. DeCato Bros.*, 129 N.H. at 508–09, 529 A.2d at 954 (fact that "the rate of interest ... could be readily ascertained by simple comparison of the principal amount financed with the face amount of the notes ... does not vitiate noncompliance" with non-disclosure statute); *American Improvement v. MacIver*, 105 N.H. 435, 438, 201 A.2d 886, 887 (1964) (noting that analogous lending disclosure statute, § 399–B, was enacted to inform "average individuals who have neither the capability nor the strength to calculate the cost of the credit that has been extended to them"). Indeed, SMHLA, section 3, was amended in 1967, even before deregulation, specifically to eliminate the option previously allowed the lender to express the interest charge either by percentage, "or by its equivalent in money." N.H.Rev.Stat. § 258:5.[13]

We conclude that the appellants' failure to disclose the percentage interest rate as required under SMHLA, section 3, was sufficient to form a predicate "unfair or deceptive practice or act" under CPA, section 2, and that the plaintiff was entitled to such an instruction.[14]

### 3. "Willfulness" Instruction

Appellants argue that the district court misinstructed the jury that appellants' conduct could be determined "willful" if appellants knew that the rate of interest was not stated in the notes. Since the complaint alleged a violation of SMHLA, section 3, and a "willful" violation of section 3 would

---

**12.** Massachusetts caselaw is replete with decisions holding that a failure to disclose a material fact may constitute an unfair or deceptive practice. *See, e.g., Heller v. Silverbranch Constr. Corp.*, 376 Mass. 621, 382 N.E.2d 1065 (1978) (failure to disclose drainage problem to home buyer); *York v. Sullivan*, 369 Mass. 157, 338 N.E.2d 341 (1975) (failure to disclose imminent rental increase).

**13.** Interestingly, several witnesses made widely divergent calculations of the percentage rate appellants charged Pugliese—ranging from 36% to 52%. Additionally, Pugliese testified that he would have "thought about [the loan] a little more," and was "not sure" he would have agreed to its terms, had he been informed that the annual interest rate on the $75,000 loan was 45%. *See, e.g., Southwest Sunsites, Inc. v. FTC*, 785 F.2d 1431, 1435 (9th Cir.) (plaintiff need not prove actual deception, but only that representation had capacity to mislead), *cert. denied*, 479 U.S. 828, 107 S.Ct. 109, 93 L.Ed.2d 58 (1986); *Montgomery Ward & Co. v. FTC*, 379 F.2d 666, 670 (7th Cir.1967) (same); *Goodman v. FTC*, 244 F.2d 584, 602 (9th Cir.1957) (same).

**14.** Appellants cite *Welch v. Fitzgerald–Hicks Dodge, Inc.*, 121 N.H. 358, 430 A.2d 144 (1981), for the proposition that a violation of CPA, § 2, cannot be established absent a showing of bad faith on the part of the defendant. In *Welch*, the court found no evidence that the defendants "acted in bad faith, dishonestly, or in any way attempted to take unfair advantage ..." *Id.* at 362, 430 A.2d at 147 ("We fail to see how the good faith attempts of the defendants to comply with the terms of a standard warranty can be classified as an unfair or deceptive practice.") In *Welch*, however, the defendants complied with the literal requirements of their warranty; in this case, it is undisputed that appellants did not comply with the interest rate disclosure requirements of SMHLA, §§ 2 & 3.

expose appellants to criminal penalties, *see* N.H.Rev.Stat.Ann. § 398–A:7–a, *see infra* p. 20, appellants argue that the court should have given the jury some sort of *mens rea* instruction, requiring that appellants have had specific knowledge that their conduct violated a statute.

The substantive provisions of the New Hampshire statutes which were read to the jury (SMHLA §§ 2 & 3, CPA §§ 2 & 10 [first clause] and UCPA §§ 2 & 3) do not state a "willfulness" requirement. Thus, the court's extraneous instruction defining "willfulness" [15] ultimately imposed a more stringent *mens rea* requirement than required by the statutory language. *Davet v. Maccarone*, 973 F.2d 22, 26 (1st Cir.1992) ("harmless error" standard of review applicable to jury instruction challenge); *see also, e.g., Smith v. Brady*, 390 F.2d 176, 177 (4th Cir.1968) (jury instruction on damages which had no effect on verdict held "harmless").

The gratuitous instruction on willfulness conceivably could have had relevance to two statutory provisions, SMHLA, section 7–a, and CPA, section 10, neither of which was read to the jury. The SMHLA provides but two remedies for violations of SMHLA, section 3. If a lender knowingly [16] omits the rate of interest from a promissory note—willfully or otherwise—the borrower may maintain a private cause of action under SMHLA, sections 2, 3 and 7, to recover any interest received by the lender in excess of the interest rate "agreed upon in the note." *See supra* pt. II.A.1. If the section 3 violation was "will-

ful," however, the lender is subject to criminal penalties as well. SMHLA, section 7–a, provides:

> Any person who *wilfully violates* any provision of this chapter [SMHLA] shall be guilty of a misdemeanor if a natural person, or guilty of a felony if any other person, for each such violation.

(Emphasis added.)

■ The special verdict form reflects a jury finding that appellants "knowingly" failed to disclose the rate of interest. Since the "willfulness" element (*i.e.*, appellants' knowledge or disregard of the statutory requirement that the rate of interest be stated in the note) would be relevant only to the imposition of a criminal penalty under section 7–a (section 7–a never having been read to the jury), the failure to give a "specific intent" instruction was "harmless" error at most; [17] at best, the jury instruction amounted to beneficial error, as it placed on the plaintiff a more difficult burden of proof.

The only other statute to which a determination of "willfulness" would have been relevant is CPA, section 10, which provides that "[i]f the [factfinder] finds that the use of the method of competition or the act or practice was a *willful and knowing* violation of this chapter, it shall award as much as 3 times, but not less than 2 times, such amount." (Emphasis added.) Like SMHLA, section 7–a, this portion of CPA, section 10, was never read to the jury. [18] The special verdict form did not request a

---

**15.** The court gave the following instruction to the jury:

> If you find that either Armand Roberts or Golden Investment, or [their] Attorney ... had actual knowledge or notice of the violations of [the SMHLA] *and of the bar against collecting interest contained in that law* and they went ahead with the foreclosure anyway in an attempt to collect more interest, then you should find that they violated [the CPA].

(Emphasis added.) Thus, in the event the jury considered whether appellants' conduct constituted a criminal violation of the SMHLA (as opposed to a non-willful "technical" violation), the quoted instruction insulated the jury charge from appellants' challenge—that a finding of specific intent was required. *Veranda Beach Club Ltd. Partnership v. Western Sur. Co.*, 936

F.2d 1364, 1384 (1st Cir.1991) (jury charge to be viewed "as a whole").

**16.** As the notes were prepared by Roberts' attorney, the jury was asked to determine whether Roberts had notice that the percentage rates of interest were omitted, and whether these omissions had the capacity to deceive, within the meaning of CPA, § 2.

**17.** In closing argument, plaintiff's counsel never referred to a "criminal" violation of the SMHLA. Moreover, the jury instruction simply referred to a "violation" of SMHLA, § 3, not a "criminal violation."

**18.** Prior to the jury charge, plaintiff's counsel disclaimed double or treble damages.

finding as to whether plaintiff's "damages" should be doubled or trebled, and the district court did not in fact double or treble the award. Any error in the "willfulness" instruction was therefore harmless.

4. *"Incidental" Exemption Instruction*

SMHLA, section 10(II), exempts from its coverage "individuals or corporations who make mortgage loans *incidental to* the conduct or the operation of another business, *such as real estate or construction.*" (Emphasis added.) The jury was instructed to determine: (1) whether "the principal activity of Golden Investment Corporation" was real estate investment and (2) if so, whether these loans were "incidental" to its real estate investment business. The district court defined the term "incidental" to encompass a matter which "inseparably depends on, pertains to, and is subordinate to the main or principal project [of the business]."

Appellants argue that the court improperly required a threshold determination that the principal activity of Golden Investment was real estate investment, thereby disenfranchising its defense if the jury found that *general* investment was Golden Investment's principal business activity. We disagree.

■ Section 10 itself restricts the exemption to a limited category of businesses; namely, those already engaged in *real estate*-related activities "such as" real estate construction or investment. In real estate-related activities, there exists a greater business need to afford mortgage loan financing to customers as an ancillary commercial service. *Cf. Moore v. New Hampshire Ins. Co.,* 122 N.H. 328, 333, 444 A.2d 543, 546 (1982) (defining plain meaning of term "incidental"; " 'a hardware store dealing in paint and wallpaper would *commonly rent* equipment for removal of wallpaper and a reasonable person ... would

assume such rental is incidental to the operation of the store.' ") (emphasis added) (citation omitted). The necessary nexus was not lost on the district court; its instruction required the jury to consider whether the loans "inseparably depend[ed]" on appellants' main business activity.[19]

■ Appellants claim that the jury should have been instructed that "incidental" means "occurring merely by chance or without intention or calculation, or being likely to inure as a minor consequence." To the extent appellants suggest a definition based on mere fortuity, it clearly does not comport with the statutory context, or the legislative intent, underlying the section 10 exemption.[20] Moreover, we see no significant difference between the language utilized in the jury instruction ("subordinate to the main or principal project") and the second element in the definition proposed by appellants ("minor consequence"), as both require the jury to determine whether the second mortgage lending activity on which Pugliese's cause of action is predicated constituted a *relatively* minor aspect of appellants' overall business activity. We find further support for our interpretation of the term "incidental" in the opinion previously rendered by the New Hampshire Supreme Court in this case:

> [L]oans made by a corporation formed to engage in *real estate investment* are exempt from the requirements of RSA chapter 398–A, assuming they are "incidental" to the conduct of that business.... [W]e do not ignore the improbability that a loan advanced for purposes of posting bail or purchasing a boat trailer could ever be considered incidental to the business of a corporation formed to engage in *real estate investment.*

*Chroniak v. Golden Inv. Corp.,* 133 N.H. 346, 352, 577 A.2d 1209, 1214 (1990) (emphasis added). The evidence not only

---

**19.** We note further that appellants did not produce sufficient evidence to support their contention that Golden Investment was formed to engage in general investment. The two mortgage loans to Pugliese were the *only* significant business conducted by appellants during the entire time period at issue in the case.

**20.** The first element in the proposed definition seems especially discordant in the present context, as few loans totalling $95,000 could ever be found to have been made "without intention or calculation."

showed that these loans were not a subordinate or minor activity of Golden Investment, the evidence disclosed that Golden Investment's *only* significant income-generating activity during the entire relevant period derived from these two loans to Pugliese.

We conclude that the jury instruction on SMHLA, section 10, did not constitute reversible error.[21]

### B. The Pugliese Cross-appeal

■ Pugliese claims he was entitled to recover attorney fees because the jury must have based its award on one of the three fee shifting statutes (SMHLA, §§ 2 & 7; CPA, § 10; UCPA, § 4).[22] The district court denied an attorney fee award because it could not exclude the possibility that the jury verdict was based on a violation of SMHLA, section 3, which does not authorize attorney fees. As we have determined that a violation of SMHLA, section 3, would necessarily entail a violation of SMHLA, section 2, *see supra* pt. II.A.1, we are able to conclude that the jury verdict was based on a fee shifting statute, either SMHLA, §§ 2 & 7, CPA, §§ 2 & 10, or UCPA, §§ 2 & 4. Accordingly, we remand

for reconsideration of the motion for an award of attorney fees.

*The district court judgment is affirmed on the merits and the case is remanded for reconsideration of the motion for an award of attorney fees.*

---

**21.** Appellants raise four other unsuccessful claims on appeal, based generally on their characterization of the jury instructions as "confusing." First, appellants failed to preserve their claim that the jury may have been misled when the district court read CPA, § 10, out of sequence (*i.e.*, between its reading of SMHLA, § 3, and SMHLA, § 10). When asked by the court whether the provision of photocopies of these statutes to the jury in the correct sequential order would satisfy appellants' objections, defense counsel responded in the affirmative.

Second, appellants maintain that the statutes were inherently confusing, and should not have been read verbatim to the jury. We do not conclude that the statutes are inherently confusing; moreover, even such a conclusion would not benefit appellants since the jury was guided by the special verdict form, which described the essential findings required under the three statutes. *See supra* p. 1143.

Third, appellants argue that the court should have defined the statutory term "ordinary course of business," a relevant term under both the CPA and the UCPA. In *Chase v. Dorais,* 122 N.H. 600, 448 A.2d 390 (1982), the court held that the CPA does not apply " 'where the trans-

action is strictly private in nature, and is in no way undertaken in the ordinary course of a trade or business.' " *Id.* at 602, 448 A.2d at 391–92 (quoting *Lantner v. Carson,* 374 Mass. 606, 610, 373 N.E.2d 973 (1978)). UCPA, § 1, likewise provides in pertinent part:

IV. "Creditor" means a person who in the *ordinary course of business* engages in consumer credit transactions with consumers.

(Emphasis added.) We do not believe the term "ordinary course of business" was used in any technical sense, or required further explanation by the court. The special verdict form adequately formulated the essential distinction raised by appellants' defense—whether appellants were engaged in a "business" activity when they loaned these funds to Pugliese, or whether the loans were between "private" individuals.

Finally, appellants incorrectly assert that the district court did not read the statutory definition of "creditor" appearing in UCPA, § 1(IV). *See* Tr. at 771–72.

**22.** Pugliese theorized that the jury must have found that the $27,000 note contained a $7,000 prepayment penalty, which constituted an independent violation of SMHLA, § 2. *See supra* p. 1142. We need not address this issue.