CURTIS MANUFACTURING
COMPANY, INC.

v.

PLASTI–CLIP CORPORATION, et al.

Civ. No. 89–430–SD.

United States District Court,
D. New Hampshire.

Nov. 21, 1994.

Jack R. Pirozzolo, Willcox Pirozzolo, & McCarthy, Boston, MA, Craig L. Staples, Cleveland, Waters & Bass, PA, Concord, NH, for Curtis Mfg. Co., Inc.

William O. Hennessey, Hayes, Soloway, Hennessey, Grossman & Hage, Jamie N. Hage, Roussos, Hage & Hodes, W. Wright Danenbarger, Wiggins & Nourie, Manchester, NH, for defendants.

## ORDER

DEVINE, Senior District Judge.

In this consolidated civil action, the parties raise a number of issues relating to bankruptcy, patent infringement, and certain business-related competitive torts. The court has federal question jurisdiction, which encompasses supplemental state law issues as well. 28 U.S.C. §§ 1331, 1334, 1338, 1367. Presently before the court is the motion to dismiss or for summary judgment filed by both Curtis and Judd,[1] to which Plasti–Clip and Faneuf object.

### Factual History

Daniel Faneuf invented a plastic clip device which is manufactured and sold through a company of which he is the president and sole stockholder, Plasti–Clip Corporation (Plasti–Clip). The Faneuf clip was issued United States Letters Patent Number 4,277,-863 ('863 patent) on July 14, 1981. In late March or early April of 1989, Faneuf entered into negotiations with Curtis Manufacturing Company (Curtis), a computer peripheral products company, and its president, Thomas W. Judd, at Curtis's instigation regarding the feasibility of adapting the Faneuf clip to accommodate Curtis's document holder application. Prior to the complete breakdown of negotiations between Faneuf and Curtis in September of 1989, Curtis's patent counsel filed a patent application which incorporated Faneuf's revised clip design but indicated Judd as the inventor. On February 12, 1990, United States Letters Patent Number 4,902,-078 ('078 patent) was issued to Curtis as the assignee of Judd for a plastic clip document holder device which incorporates the accused plastic clip.

### Procedural History

On September 8, 1989, Curtis brought action against Plasti–Clip and Faneuf under federal patent law seeking a declaration of noninfringement and invalidity as to the '863 Patent. For the nearly five years thereafter, plaintiffs and defendants have been litigating the validity of the patents at issue. Plasti–Clip and Faneuf filed counterclaims against Curtis and Judd on October 19, 1989. Said action, *Curtis Manufacturing Company, Inc. v. Plasti–Clip Corporation, et al,* Civil No. 89–430–SD, was automatically stayed on March 1, 1991, based on Curtis's filing for reorganization pursuant to Chapter 11 of the Bankruptcy Act, 11 U.S.C. § 1101, et seq.

Plasti–Clip and Faneuf brought direct action against Judd on July 13, 1992, and amended their complaint on August 11, 1992. *Plasti–Clip Corporation, et al v. Judd,* Civ. No. 92–360–B. The amended complaint contains claims under federal patent law for infringement of the '863 Patent and fraudulent procurement of the '078 Patent and claims for violation of federal and New Hampshire antitrust laws, and for violation of New Hampshire prohibitions on unfair trade practices, as well as common law claims for breach of contract/quantum meruit, tortious

---

**1.** Counsel for Curtis and Judd request oral argument in order to address the particulars of the instant motion. Standard practice under the local rules is for motions to be decided "without oral argument on the basis of papers filed." Local Rule 11(g). Further, in its discretion the court may allow oral argument "after consideration of a *written statement* by counsel *outlining*

*the unusual reasons* why oral argument" would be of assistance to the court. *Id.* (emphasis added). The court finds that in light of the volume of papers filed in conjunction with the instant motion, oral argument is unnecessary to a proper determination of the motion. Therefore, the request for oral argument must be and herewith is denied.

interference with contractual relations, and conversion/idea misappropriation.

On September 22, 1992, Judd filed counterclaims against Plasti–Clip and Faneuf under federal patent law for noninfringement and invalidity as to the '863 Patent. In their amended counterclaim, Plasti–Clip and Faneuf brought claims for infringement of the '863 and/or the '078 Patent since April 1, 1993, fraudulent procurement of the '078 Patent, violation of federal and New Hampshire antitrust claims, violation of New Hampshire prohibitions on unfair trade practices, as well as a common-law claim for conversion/idea misappropriation.

Plasti–Clip and Faneuf moved to consolidate the two actions on March 2, 1994. On March 31, 1994, this court, recognizing the substantial similarity between the factual allegations and legal theories supporting the claims raised in each of the respective actions, ordered their consolidation pursuant to Rule 42(a), Fed.R.Civ.P.[2] In addition, since plaintiffs argued that defendants' claims were barred by operation of the Bankruptcy Act at 11 U.S.C. 524(a)(2) and 1141(d)(1)(A), they were ordered by the court to file a motion for summary judgment to that effect. On May 16, 1994, plaintiffs, complying with the court's order, submitted the instant motion to dismiss or for summary judgment, along with a substantial number of materials outside the pleadings. Defendants, in turn, filed a motion in opposition thereto, similarly appended. In light of the voluminous materials presented in conjunction with the briefs, the court will treat the motion as one for summary judgment pursuant to Rule 12(b), Fed.R.Civ.P.

*Discussion*

1. *Summary Judgment Standard*

Summary judgment shall be ordered when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. Since the purpose of summary judgment is issue finding, not issue determination, the court's function at this stage " 'is not [ ] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.' " *Stone & Michaud Ins., Inc. v. Bank Five for Savings*, 785 F.Supp. 1065, 1068 (D.N.H. 1992) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2516, 91 L.Ed.2d 202 (1986)). Although summary judgment may well be appropriate if the nonmovant chooses to merely rely upon some combination of "conclusory allegations, improbable inferences, and unsupported speculation," *Medina–Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir.1990), the entire record will be scrutinized in the light most favorable to the nonmovant, with all reasonable inferences indulged in that party's favor. *Maldonado–Denis v. Castillo–Rodriguez*, 23 F.3d 576, 581 (1st Cir.1994); *see also Brennan v. Hendrigan*, 888 F.2d 189, 191 (1st Cir.1989); *Mack v. Great Atlantic & Pacific Tea Co.*, 871 F.2d 179, 181 (1st Cir.1989).

The respective roles of the movant and the nonmovant in summary judgment practice are precisely choreographed. The First Circuit has described the steps in the following manner:

> The movant must put the ball in play, averring "an absence of evidence to support the nonmoving party's case." The burden then shifts to the nonmovant to establish the existence of at least one fact issue which is both "genuine" and "material." A "genuine" issue is one "that properly can be resolved only by a finder of fact because [it] may reasonably be resolved in favor of either party." Put another way, a "genuine" issue exists if there is "sufficient evidence supporting the claimed factual dispute" to require a choice between "the parties' differing versions of the truth at trial." A "material" issue is one that "affect[s] the outcome of the suit," that is, an issue which, perforce, "need[s] to be resolved before the related legal issues can be decided."

2. Since the April 4, 1994, Order of Consolidation denominated Civil No. 89–430–SD as the main case, Curtis and Judd will hereinafter be referred to as "plaintiffs", and Plasti–Clip and Faneuf will hereinafter be referred to as "defendants."

*Garside v. Osco Drug, Inc.*, 895 F.2d 46, 48 (1st Cir.1990) (citing and quoting, *inter alia*, *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 [106 S.Ct. 2548, 2554, 91 L.Ed.2d 265] (1986), and *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 [106 S.Ct. 2505, 2511, 91 L.Ed.2d 202] (1986) (other citations omitted)).

*Maldonado–Denis, supra,* 23 F.3d at 581.

■ "[M]otions for summary judgment must be decided on the record as it stands, not on litigants' visions of what the facts might some day reveal." *Id.* Thus, on issues as to which the nonmovant bears the ultimate burden of proof, he must " 'present definite, competent evidence to rebut the motion.' " *Id.* (quoting *Mesnick v. General Elec. Co.*, 950 F.2d 816, 822 (1st Cir.1991), *cert. denied,* 504 U.S. 985, 112 S.Ct. 2965, 119 L.Ed.2d 586 (1992)). Finally, summary judgment, and its concomitant standard, "is as available in patent cases as in other areas of litigation." *Continental Can Co. U.S.A., Inc. v. Monsanto Co.*, 948 F.2d 1264, 1265 (Fed. Cir.1991).

### 2. The Effect of Curtis's Bankruptcy

■ As a preliminary matter, plaintiffs allege that the Curtis reorganization (1) bars Plasti–Clip from asserting claims based upon pre-petition events and (2) vests in Curtis its property (the '078 patent) free of all claims by Plasti–Clip. Defendants oppose these contentions, arguing that Curtis's bankruptcy discharge neither operates as a bar to post-confirmation causes of action nor prevents the use of pre-confirmation facts to establish said post-confirmation causes of action. Moreover, defendants assert that regardless of the effect a discharge from bankruptcy has on the property of the debtor, the validity of the '078 patent is at issue and reasonable doubt exists concerning who is the rightful "owner" of said patent.

Two sections of the Bankruptcy Act are implicated by plaintiffs' motion. Section 1141 outlines the effect of confirmation of the reorganization. In pertinent part, section 1141 provides as follows:

(a) Except as provided in subsections (d)(2) and (d)(3) of this section, the provisions of a confirmed plan bind the debtor, any entity issuing securities under the plan, any entity acquiring property under the plan, and any creditor, equity security holder, or general partner in the debtor, whether or not the claim or interest of such creditor, equity security holder, or general partner is impaired under the plan and whether or not such a creditor, equity security holder, or general partner has accepted the plan.

(b) Except as otherwise provided in the plan or the order confirming the plan, the confirmation of a plan vests all of the property of the estate in the debtor.

(c) Except as provided in subsections (d)(2) and (d)(3) of this section and except as otherwise provided in the plan or in the order confirming the plan, after confirmation of a plan, the property dealt with by the plan is free and clear of all claims and interests of creditors, equity security holders, and of general partners in the debtor.

(d)(1) Except as otherwise provided in this subsection, in the plan, or in the order confirming the plan, the confirmation of a plan—

(A) discharges the debtor from any debt that arose before the date of such confirmation. . . .

11 U.S.C. § 1141(a)–(d)(1)(A). Similarly, section 524 details the effect of discharge from bankruptcy as follows:

(a) A discharge in a case under this title—

(1) voids any judgment at any time obtained, to the extent that such judgment is a determination of the personal liability of the debtor with respect to any debt discharged under section 727, 944, 1141, 1228, or 1328 of this title, whether or not discharge of such debt is waived;

(2) operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability of the debtor, whether or not discharge of such debt is waived; and

(3) operates as an injunction against the commencement or continuation of an action, the employment of process, or an act,

to collect or recover from, or offset against, property of the debtor of the kind specified in section 541(a)(2) of this title that is acquired after the commencement of the case....

11 U.S.C. § 524(a)(1)–(3).

Plaintiffs place great weight on the general understanding that "one of the primary purposes of the Bankruptcy Code is to afford debtors a new opportunity and a clear chance for the future, unhampered by pressures of debts from the past." *In re France,* 63 B.R. 777, 780 (D.N.H.1986). Indeed,

> The act of plan confirmation is, perhaps, the major event in a Chapter 11 proceeding. At that point, the debtor receives an unencumbered fresh start, being discharged of pre-confirmation debts and vested with all property of the estate to the extent specified in Title 11, United States Code, Section 1141.

*In re Dahlgren Int'l, Inc.,* 147 B.R. 393, 404 (N.D.Tex.1992). Pre-confirmation, however, "does not encompass a post-confirmation time frame." *Id.*

Acknowledgement of the distinction between these two time frames is particularly apposite to the resolution of the instant issue. That this is a distinction with a difference is bolstered by the notion that bankruptcy "'was intended to protect the debtor from the continuing costs of pre-bankruptcy acts but not to insulate the debtor from the costs of post-bankruptcy acts.'" *In re Sure–Snap Corp.,* 983 F.2d 1015, 1018 (11th Cir.1993) (quoting *In re Hadden,* 57 B.R. 187, 190 (Bankr.W.D.Wis.1986)).

Reinforcing this conclusion, the Supreme Court has noted that "[e]ven if § 1141(a) binds creditors of the corporate and individual debtors with respect to claims that arose before confirmation, *we do not see how it can bind ... any ... creditor with respect to postconfirmation claims."* *Holywell Corp. v. Smith,* 503 U.S. 47, 58, 112 S.Ct. 1021, 1028, 117 L.Ed.2d 196 (1992) (emphasis added).

■ Plaintiffs assert that due to the confirmation of Curtis's reorganization plan, defendants are enjoined from using pre-confirmation facts to establish a post-confirmation cause of action. However, patent law provides that each act of patent infringement constitutes a separate cause of action. *See A.C. Aukerman Co. v. R.L. Chaides Constr. Co.,* 960 F.2d 1020, 1031 (Fed.Cir.1992) (patent infringement is a continuing tort). "[A]lleged acts of infringement that occur post-confirmation are separate causes of action from those that occur pre-confirmation, and the former necessarily give rise only to post-confirmation claims." *In re Dahlgren, supra,* 147 B.R. at 404 n. 16.

■ By virtue of the discharge, although the infringement may have taken place and damages incurred, defendants' pre-confirmation causes of action have been extinguished. *See, e.g., Wagner v. United States,* 573 F.2d 447, 453 (7th Cir.1978) ("[A] discharge does not cancel the obligation; the obligation still exists. A discharge merely disables the creditor from enforcing its claim."). Recognizing this, defendants only assert damages for plaintiffs' continuing use of the subject patented clip after April 1, 1993, the date when plaintiffs emerged from the protective cloak of bankruptcy. It is this continuous, rather than pre-confirmation, usage which distinguishes this case from those cited in plaintiffs' motion. It is clear to this court that "section 1141(d)(1)(A) [does] not discharge any claim ... which arises from the debtor's use ... postconfirmation." *In re Polysat,* 152 B.R. 886, 891 (Bankr.E.D.Pa. 1993) (citing *Holywell Corp., supra*). As such, the court finds that the "new opportunity" afforded by a bankruptcy proceeding cannot and does not absolve a debtor of liability incurred due to post-confirmation activities. Likewise, nowhere in the Bankruptcy Act can there be found a literal prohibition regarding the use of pre-confirmation facts to support a cause of action based on post-confirmation acts.

■ Furthermore, the court is unpersuaded by plaintiffs bare allegation that the proprietary rights to the '078 patent vested in Curtis upon confirmation of the reorganization plan. Although a discharge terminates the bankruptcy estate and the remaining property returns to the debtor, said property is assumed to have rightfully belonged to the

debtor originally. Since it is the validity of the '078 patent which is squarely at issue, questions remain that are inappropriate for resolution at the summary judgment stage.

Plaintiffs' motion for summary judgment, insofar as it seeks to enjoin defendants' post-confirmation causes of action as barred by the Bankruptcy Act, therefore must be and herewith is denied.

### 3. Patent Infringement

"Because ... [patent] infringement is itself a fact issue, a district court must approach a motion for summary judgment of infringement or non-infringement with a care proportioned to the likelihood of its being inappropriate." *SRI Int'l v. Matsushita Elec. Corp. of America,* 775 F.2d 1107, 1116 (Fed. Cir.1985) (citations omitted); *see also Gillette Co. v. Warner–Lambert Co.,* 690 F.Supp. 115 (D.Mass.1988) (summary judgment usually inappropriate in fact-driven patent infringement cases); *Precision Metal Fabricators, Inc. v. Jetstream Systems, Co.,* 693 F.Supp. 814, 815 (N.D.Cal.1988) ("Summary judgment is rarely appropriate in patent infringement actions"). Moreover,

> [a]lthough the same standard for summary judgment is used in patent cases as in other cases, the standard is somewhat more difficult to meet in patent cases, because not only must no genuine issues of material fact exist, but to grant summary judgment properly, the trial court must in addition construe the claim correctly and conclude that it would be not possible for the trier of fact to find infringement.

*Safe Flight Instrument Corp. v. Sundstrand Data Control, Inc.,* 706 F.Supp. 1146, 1149 (D.Del.1989), *aff'd without opinion,* 899 F.2d

1228 (Fed.Cir.), *cert. denied,* 498 U.S. 919, 111 S.Ct. 295, 112 L.Ed.2d 249 (1990).

■■■ It is an undisputed principle of law that in order to make a finding of infringement a two-step analysis is required: (1) the claim must be properly construed to determine its scope and meaning, and (2) the claim as properly construed must be compared to the accused device or process.[3] *Conroy v. Reebok Int'l, Ltd.,* 14 F.3d 1570, 1572 (Fed. Cir.1994); *Carroll Touch, Inc. v. Electro Mechanical Sys.,* 15 F.3d 1573, 1576 (Fed.Cir. 1993). The former inquiry is a question of law for the court, while the latter is a question of fact. *Minnesota Mining & Mfg. Co. v. Johnson & Johnson Orthopaedics, Inc.,* 976 F.2d 1559, 1570 (Fed.Cir.1992) (citing *C.R. Bard, Inc. v. Advanced Cardiovascular Sys., Inc.,* 911 F.2d 670, 673 (Fed.Cir.1990)).[4] This latter determination—whether the claims cover the accused device—has been characterized as "the ultimate determination of infringement" and, as an issue of fact, "should be approached with great care by the district court" when ruling on a motion for summary judgment. *Palumbo v. Don–Joy Co.,* 762 F.2d 969, 974 (Fed.Cir.1985) (citing *D.M.I., Inc. v. Deere & Co.,* 755 F.2d 1570, 1573 (Fed.Cir.1985)).

■■■ Despite the fact that claim interpretation is generally considered to be a question of law, such interpretation "may depend upon conflicting evidentiary material which can give rise to a genuine factual dispute." *C.R. Bard, supra,* 911 F.2d at 673; *see also Aid Pack, supra* note 3, 641 F.Supp. at 694 ("Even though claim interpretation is a legal issue, if the meaning of a term of art in the claim is disputed and extrinsic evidence is

---

3. This comparison itself may involve a two-step process: First, it must be determined whether the accused structure literally infringes the claims. Second, if there is no literal infringement, the doctrine of equivalents must be applied to determine whether the accused device performs substantially the same function in substantially the same way for substantially the same purpose. *See Aid Pack, Inc. v. Beecham, Inc.,* 641 F.Supp. 692, 694 (D.Mass.1986), *aff'd without opinion,* 826 F.2d 1071 (Fed.Cir.1987).

4. Dividing the analysis into this dichotomy was mandated by the Supreme Court as early as

*Winans v. Denmead,* 56 U.S. (15 How.) 330, 14 L.Ed. 717 (1854). In this regard, the Court noted,

> [T]wo questions arise. The first is, what is the thing patented; the second, has that thing been constructed, used, or sold by the defendants. The first is a question of law, to be determined by the court, construing the letters-patent, and the description of the invention and specification of claim annexed to them. *The second is a question of fact, to be submitted to a jury.*

*Id.* at 338, 14 L.Ed. 717 (emphasis added).

needed, summary judgment is not appropriate.").

The *Palumbo* court summarized this rationale as follows:

Construction of a claim, a question of law, is necessary to define the metes and bounds of the protection afforded by the claims. If the language of a claim is not disputed, then the scope of the claim may be construed as a matter of law. But when the meaning of a term in the claim is disputed and extrinsic evidence is necessary to explain that term, then an underlying factual question[ ] arises, and construction of the claim should be left to the trier or jury under appropriate instruction.

*Palumbo, supra,* 762 F.2d at 974 (citation omitted).[5]

In order to properly construe the scope of a patent claim, courts "must look to the language of the claim, and the patent's specification and prosecution history...." *Read Corp. v. Portec, Inc.,* 970 F.2d 816, 823 (Fed.Cir.1992); *see also Whittaker Corp. v. UNR Indus., Inc.,* 911 F.2d 709, 711 (Fed. Cir.1990) ("Proper interpretation of claims requires consideration of the specification, the prosecution history, the other claims and expert testimony where appropriate"); *SRI Int'l, supra,* 775 F.2d at 1118 ("A claim is construed in the light of the claim language, the other claims, the prior art, the prosecution history, and the specification, *not* in light of the accused device"). Any factual disputes that arise must be resolved before a claim may be properly interpreted. *C.R. Bard, supra,* 911 F.2d at 673.

Thus, in delineating the boundaries of a patented invention and the scope of a patentee's rights, the court begins by examining the precise words of the claim. *See, e.g., Amgen, Inc. v. Chugai Pharmaceutical Co., Ltd.,* 706 F.Supp. 94, 99 (D.Mass.1989)

(" 'In determining whether an accused device or composition infringes a valid patent, resort must be had in the first instance to the words of the claim.' " (quoting *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.,* 339 U.S. 605, 607, 70 S.Ct. 854, 855, 94 L.Ed. 1097 (1950))).

The '863 patent contains five claims, with claims 2–4 dependent on independent claim 1 and claim 5 dependent on claim 4. The claims recite as follows:

1. A spring clip comprising: two elongate, relatively stiff members; a relatively flexible web forming a hinge joining the two members intermediate their ends; opposed jaw portions on respective members at one side of the hinge; and a spring finger on one member at the other side of the hinge resiliently biased into engagement against the other member so as yieldingly to hold the jaws closed, the spring finger forming an open loop disengageable from the other member for insertion through an aperture in an article, whereby the finger serves both as a spring to close the jaws and a holder for the article.

2. A clip according to claim 1 wherein the loop is offset from the members so that the sheet may hang parallel to the members.

3. A clip according to claim 1, in combination with a sheet having an aperture receiving the finger.

4. A clip according to claim 1 wherein said spring finger is intergral [sic] with and extends from one of said members reentrantly between said members into engagement inside the other member thereby to prevent the article from sliding off the spring finger.

5. A clip according to claim 4 wherein said spring finger slides along the other member when said spring finger is com-

---

5. This is not to say that simple disagreement over the meaning of a term in a claim rises to the level of a factual dispute sufficient to prevent summary judgment. *See Johnston v. IVAC Corp.,* 885 F.2d 1574, 1579–80 (Fed.Cir.1989). In such an instance, the court should attempt to resolve the facial conflict through resort to the prosecution and specification history or other extrinsic evidence. *Id.* at 1579. If, however, the underlying probative evidence continues to be susceptible to genuine evidentiary conflict, the resolution of which can only be resolved by way of expert testimony or complex scientific principles, then the term is considered an issue of fact, and summary judgment is inappropriate. *Id.* (citing *Howes v. Medical Components, Inc.,* 814 F.2d 638, 643 (Fed.Cir.1987)).

pressed to open the jaws, and said other member includes a stop limiting sliding of the finger and opening of the jaws.

The '078 patent contains nine claims, with claims 2–8 wholly dependent on claim 1 and claim 9 partially dependent on claim 1. Claim 1, which describes the clip element, recites, in pertinent part, as follows:

1. A document holder clip adapted to hold a document adjacent a monitor screen, which comprises in combination:

. . . .

(d) a slidably mounted document clip means to retain a document, which holder means comprises:

(i) a pair of generally parallel clip arm elements having a one and an other end, that the one end forming opposing jaws on either side of the extending arm;

(ii) a resilient hinge means generally intermediate the generally parallel clip arm elements;

(iii) a clip retaining means between the clip arm elements and below the hinge means which extend and fit over flanges of the arm to retain the clip means on the arm and to permit the slidable movement along the upper edge of the arm of the document clip in use;

(iv) a resilient, bent spring finger at the other end of one of the clip arm elements, the spring finger inclined inwardly toward the hinge means; and

(v) a spring finger retainer at the other end of the other arm clip element whereby the one end of the resilient spring finger is engaged in the spring finger retainer so that the opposing jaw elements are biased in closed, inward, document retaining position adjacent to the surface of the extending arm so as to retain a document between at least one jaw end and the surface of the extending arm and whereby upon the application of finger pressure on the heads of the clip arm element, one end of the spring finger moves downwardly toward the hinge means and away from the retaining stop to place the opposing jaws in an open position for the removal of the document.

. . . .

6. The clip of claim 1 wherein the spring finger retainer at the other end of the other clip arm element also includes an inner flange extending to the spring finger retainer whereby on the occasion of finger pressure by the user to the other end of the clip arm elements, one end of the spring finger element moves from a retaining position slidably downwardly on the inner flange to permit the opposing jaw edges to move to an open position.

7. The clip of claim 1 wherein the spring finger element includes at the one end thereof a slightly raised, short arm, which short arm is placed against the spring finger retainer to place the opposing jaw edges in a resiliently biased, closed position.

After reviewing the above-recited claim language, as well as the prosecution history and drawings included in both the '078 and '863 patents, the court finds that both patents describe a clip device comprised of two parallel clip arms joined centrally by a stiffly flexible hinge. The unibody construction and spring biasing element uniquely disclosed in the '863 patent is substantially replicated in the device evidenced in the '078 patent. In both, it is this spring finger which serves the dual purpose of resiliently holding the opposing jaws in a closed position while likewise, when compressed, moves slidably inward so as to open the opposing jaws.

Thus delineating the scope of the claims, the court now compares same to the accused device, *Conroy, supra,* 14 F.3d at 1572, mindful of the "great care" the district court must exercise in making this comparison. *Palumbo, supra,* 762 F.2d at 974. Defendants maintain that the '078 patent literally infringes claims 1, 4, and 5 of the '863 patent. Since all claims in the '863 patent are dependent on claim 1, should the court make a finding of noninfringement as to that claim, then summary judgment would follow.

In the view of the court, the integral component of both the '863 patent and the accused device is the spring finger which, configured as an extended loop, serves a variety of functions, not the least of which is providing resilient bias. Defendants' experts con-

tend that "movants found extended loop configuration more advantageous than what they showed to the public in the '078 Patent" and "[t]hus, the accused clip infringes at least claim 1 of the ['863] Patent." Declaration of Jerry Cohen, Esq., at 8 (attached to Defendants' Memorandum Opposing Motion for Summary Judgment). Whether the spring finger of the '863 patent is the equivalent of the spring finger disclosed in the '078 patent is not for this court to say. *See Conroy, supra,* 14 F.3d at 1577 (district court improperly resolved a genuine issue of material fact in finding equivalence between two patented articles). Rather, the court finds that the evidence before it evinces the existence of a factual dispute that is both genuine and material. In consequence thereof, plaintiffs' motion for summary judgment with respect to the patent infringement claims alleged against Curtis (Count I) is herewith denied.

### 4. Individual Liability of Judd

Liability for patent infringement is set out in 35 U.S.C. § 271. Infringement is the unlicensed making, using, or selling of a claimed invention. 35 U.S.C. § 271(a);[6] *see also Rohm and Haas Co. v. Mobil Oil Corp.,* 718 F.Supp. 274, 329 (D.Del.1989); *S.R.I Int'l, supra,* 775 F.2d at 1123. In addition, one who induces an infringement is similarly liable.[7]

Plaintiffs allege that Judd is not liable under a direct infringement theory because it is Curtis, not he, who is manufacturing and selling the document holder at issue. Plaintiffs further allege that there can be no claim of infringement by inducement because defendants fail to demonstrate any specific intent on the part of Judd to encourage infringement by Curtis.

 Plaintiffs' arguments miss the mark on several levels. To begin, it is indisputable that patent infringement is a tort. *Carbice Corp. of Am. v. American Patents Dev. Corp.,* 283 U.S. 27, 33, 51 S.Ct. 334, 336,

75 L.Ed. 819 (1931); *Orthokinetics, Inc. v. Safety Travel Chairs Inc.,* 806 F.2d 1565, 1579 (Fed.Cir.1986). In this regard, the language of section 271(a) "has generally been interpreted to allow a finding of infringement against any entity be it an individual, corporation or otherwise." *Symbol Technologies, Inc. v. Metrologic Instruments, Inc.,* 771 F.Supp. 1390, 1402 (D.N.J.1993). Officers of a corporation are personally liable for tortious conduct of the corporation if they personally took part in the commission of the tort or specifically directed other officers, agents, or employees of the corporation to commit the tortious acts. *See, e.g., United States v. Mottolo,* 629 F.Supp. 56, 60 (D.N.H. 1984); *Orthokinetics, supra,* 806 F.2d at 1579. Moreover, this court has endorsed the "general rule that an officer of a corporation is liable for torts in which he personally participated, whether or not he was acting within the scope of his authority, and that such direct personal involvement by the officer is causally related to the alleged injury." *Mottolo, supra,* 629 F.Supp. at 60 (citing *Escude Cruz v. Ortho Pharmaceutical Corp.,* 619 F.2d 902, 907 (1st Cir.1980)).

Under such circumstances, there is no need to pierce the corporate veil. " 'The cases are legion in which courts have recognized and imposed personal liability on corporate officers for participating in, inducing, and approving acts of patent infringement.' " *Symbol Technologies, supra,* 771 F.Supp. at 1402 (quoting *Orthokinetics, supra,* 806 F.2d at 1579); *see generally* 4 DONALD S. CHISUM, PATENTS § 16.06[2], at 16–168 to 16–182 (1994).

 In support of their argument, plaintiffs cite *Manville Sales Corp. v. Paramount Sys., Inc.,* 917 F.2d 544 (Fed.Cir.1990). Without reason, *Manville* seemingly departed from generally settled law and sought to create a new standard for section 271(a), necessitating piercing the corporate veil in

---

**6.** Direct infringement is defined under section 271(a) as follows: "Except as otherwise provided in this title, whoever without authority makes, uses or sells any patented invention, within the United States during the term of the patent therefor, infringes the patent." 35 U.S.C. § 271(a).

**7.** 35 U.S.C. § 271(b) provides, "Whoever actively induces infringement of a patent shall be liable as an infringer."

order to find an officer of a corporation personally liable for patent infringement. *Manville, supra,* 917 F.2d at 552–53; *see also Symbol Technologies, supra,* 771 F.Supp. at 1403. Plaintiffs are unable to avail themselves of the *Manville* court's recasting of settled law for two reasons.

First, as the court in *Symbol Technologies* noted,

> It is not clear that the Federal Circuit intended in *Manville* to overturn the long-standing precedent that a corporate officer can be liable for direct infringement without piercing the corporate veil. If *Manville* does establish a new rule, it is not binding on this court as the Federal Circuit follows the rule that "prior decisions of a panel of the court are binding precedent on subsequent panels unless and until overturned *in banc.*" *Newell Cos., Inc. v. Kenney Mfg. Co.,* 864 F.2d 757, 765 (Fed. Cir.1988) [, *cert. denied,* 493 U.S. 814 [110 .S.Ct. 62, 107 L.Ed.2d 30] (1989) ]. There has been no overturning *en banc* of the previous standard of determining personal liability for infringement nor was there any reason given by the *Manville* court for any overturning of the previous standard in *Manville.* "Where there is direct conflict, the precedential decision is the first." *Newell,* 864 F.2d at 765. Therefore, until changed by an *en banc* decision, the court finds that the long-established rule that a corporate officer can be liable for direct infringement without piercing the corporate veil remains in effect.

*Symbol Technologies, supra,* 771 F.Supp. at 1403. The court is persuaded by the analysis in *Symbol Technologies* and concurs in the finding.

More specifically, however, the court notes the factual dissimilarity between the instant case and the situation in *Manville.* In reversing the district court's finding of personal liability on the part of Paramount's corporate officers for direct infringement, the Federal Circuit emphasized the fact that Paramount's officers were unaware of any patent held by Manville until the commencement of the infringement action. *Manville, supra,* 917 F.2d at 553.

In contrast, the deposition testimony taken from Ed Hames, a Curtis designer, and Richard Crowley, Curtis's patent counsel, reveals that Judd was, in the least, possessed of the knowledge that Faneuf's clip was patented.[8] Regarding Judd's knowledge, Hames testified as follows:

Q. Did you [Hames] have any discussions or any meetings within the company between the time you received this [schematic clip drawing] facsimile from Mr. Faneuf, Plaintiff's Exhibit 29, and the time that this print was sent to the mold maker?

A. Oh, it's very possible that I was asked how the clip is going or day-to-day questions, but anything that I can remember in any special meetings, no.

. . . .

Q. And who would have inquired of you regarding how it was going?

A. Oh, the president of the company, the vice president of operations of the company.

Q. And that is Thomas Judd?

A. Thomas Judd, Greg Iaquinto. Those would be the main people.

. . . .

Q. And it—and what did—did you evaluate that prototype at that time?

A. Yes, I did, and so didn't some other people in the company.

Q. Who else evaluated that clip?

A. Greg Iaquinto, Thomas Judd. I might have shown it to John Lagace, the purchaser. But the primary targets would have been Tom and Greg.

. . . .

Q. And what was your—what was your opinion regarding this prototype?

8. The inability of the parties to schedule and take Judd's deposition does no violence to the validity of defendants' allegations. Proof of "knowingly induced" infringement by "[c]ircumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence." *Moleculon Research Corp. v. CBS, Inc.,* 793 F.2d 1261, 1272 (Fed.Cir.1986), *cert. denied,* 479 U.S. 1030, 107 S.Ct. 875, 93 L.Ed.2d 829 (1987) (quoting *Michalic v. Cleveland Tankers, Inc.,* 364 U.S. 325, 330, 81 S.Ct. 6, 10–11, 5 L.Ed.2d 20 (1960)).

A. Well, that it had the aesthetics that we liked, not exactly like we liked. It's not the same thing, but it was close enough and we were pleased. We liked the sliding function of it. And I think the only real negative at that point was that it wouldn't fit in our existing package.

Q. And I guess this was—this was the feeling of everyone—

A. Everyone, yeah.

Q. —at the meeting, meaning Mr. Judd and Mr. Iaquinto?

A. It wasn't really a meeting. Just an informal discussion. Whether or not I got them both at the same time, I don't know.

. . . .

Q. Now, based on—based on that—the advice you received from Mr. Crowley,—or the opinion you received from Mr. Crowley, what did you do next?

. . . .

A. Okay. I shared some of the knowledge with Greg Iaquinto and Thomas Judd and Greg Iaquinto—that's it. That answers the question.

Deposition of Edward Hames, Vol. II, pp. 52–53, 58–59, 88.

Excerpts from the Crowley deposition provide further circumstantial proof regarding the extent of Judd's knowledge.

Q. But you [Crowley] recall receiving some instruction from Hames at Curtis to file a utility patent application?

A. I'm not sure. Either Hames or Mr. Judd. Those were the two people that instructed, that usually instruct me to file applications.

. . . .

Q. . . . What happened on this, with respect to the 078 patent application? What information did you receive from Curtis in order to prepare this application?

A. To the best of my knowledge, I believe I had a drawing of how the clip—a blueprint or a drawing of this clip.

Q. The clip that's the subject of the 078—

A. 078 patent, right.

. . . .

Q. . . . You specify in the application Thomas Judd as the inventor; is that correct?

A. That's correct.

Q. And how did you make that determination?

A. To the best of my knowledge, I either spoke to Mr. Judd or Mr. Hames or both of them.

. . . .

Q. Were you aware, at the time of your preparation of this application, that Curtis had had communications and contact with the plaintiff, Daniel Faneuf and Plasti–clip, regarding a document holder.

A. I believe so, yes.

Q. What did you know at the time that you filed—that you were preparing this patent application about that?

A. To the best of my knowledge, there was some dispute concerning whether a clip was to be marked with the Faneuf patent number.

Q. And you were aware of that as an issue at the time or prior to filing the patent application?

(Witness examining file.)

A. I'm looking through the documents to just refer to. Yes, I was aware of the Faneuf patent prior to filing.

Deposition of Richard P. Crowley, Esq., pp. 34, 36, 38–43.

▆ Plaintiffs' contention notwithstanding, willfulness or specific intent to infringe is not a prerequisite to a finding of infringement. *See* 35 U.S.C. § 271; *see also Ziggity Sys., Inc. v. Val Watering Sys.,* 769 F.Supp. 752, 795 (E.D.Pa.1990). Although the statute is void of any reference to "knowing", such a standard has been judicially imposed. *Water Technologies Corp. v. Calco, Ltd.,* 850 F.2d 660, 668 (Fed.Cir.), *cert. denied,* 488 U.S. 968, 109 S.Ct. 498, 102 L.Ed.2d 534 (1988). However, "knowledge" has generally been construed as "knowledge of an infringement controversy." *Symbol Technologies, supra,* 771 F.Supp. at 1404; *see also, Aro Mfg. Co., Inc. v. Convertible Top Replacement Co., Inc.,* 377 U.S. 476, 514, 84 S.Ct. 1526, 1546–47, 12 L.Ed.2d 457 (1964) (White, J., concurring) (plurality decision). As such,

Corporate officers are presumably aware of what they are doing, and in that sense they can be said to have acted "willfully." However, that does not mean that their acts must rise to the level recognized by the law as constituting willful infringement before they can be liable for infringement by their corporation. Hence the district court erred in positing willful infringement as a prerequisite for the imposition of personal liability for the corporation's direct infringement.

*Orthokinetics, supra,* 806 F.2d at 1579.

■ In this regard, the court reiterates that liability has been imposed on a corporate officer or director based on the effective control the individual held over the corporation and his active participation in the infringement activities.[9]

Active participation sufficient to invoke personal liability has been characterized as "the moving force" behind the infringement, *White v. Mar–Bel, Inc.,* 509 F.2d 287, 292 (5th Cir.1975); "the moving, active, conscious force behind the infringement," *Superior Testers, Inc. v. Damco Testers, Inc.,* 315 F.Supp. 934, 935 (E.D.La.1970), *Rohm and Haas Co. v. Dawson Chemical Co.,* 557 F.Supp. 739, 819 (S.D.Tex.1983); or "direct participation in and control of the infringing design, manufacture, and sale," *A. Stucki Co. v. Schwam,* 634 F.Supp. 259, 265 (E.D.Pa. 1986).

*Ziggity, supra,* 769 F.Supp. at 796.

■ Finally Judd's good-faith reliance on counsel as to noninfringement is legally insufficient and irrelevant. As the Federal Circuit has held, " 'a duty exists to obtain *competent* legal advice before initiating possibly infringing action.' " *Amicus, Inc. v. Alosi,* 723 F.Supp. 429, 432 (N.D.Cal.1989) (quoting *Rosemount, Inc. v. Beckman Instruments, Inc.,* 727 F.2d 1540, 1548 (Fed.Cir. 1984) (emphasis added)). Put differently, "[w]hen a potential infringer has *actual notice* of another's patent rights, he has the duty to 'exercise due care to determine

whether or not he is infringing.' " *Bott v. Four Star Corp.,* 807 F.2d 1567, 1572 (Fed. Cir.1986), *partially rev'd on other grounds by, A.C. Aukerman Co., supra,* 960 F.2d at 1038 (emphasis added); *see also Ceeco Mach. Mfg., Ltd. v. Intercole, Inc.,* 817 F.Supp. 979, 986 (D.Mass.1992). Although such advice may be of relevance in determining willful infringement for the purposes of increased damages under 35 U.S.C. § 284, *Central Soya Co., Inc. v. Geo. A. Hormel & Co.,* 723 F.2d 1573, 1577 (Fed.Cir.1983), advice of counsel "has no relevance here in determining whether [the corporate officer] induced infringement under § 271(b)." *Symbol Technologies, supra,* 771 F.Supp. at 1405.

In light of the testimony hereinabove set forth, and assuming arguendo that the *Manville* "knowing" standard is the rule, " '[i]ntent is a factual determination particularly within the province of the trier of fact.' " *Dow Chemical Co. v. Eby Mine Serv.,* 813 F.Supp. 749, 753 (D.Colo.1993) (quoting *Allen Organ Co. v. Kimball Int'l, Inc.,* 839 F.2d 1556, 1567 (Fed.Cir.1988)).

With due regard to the generous construction given to the facts as they relate to the nonmoving party on summary judgment and the evidentiary burden embodied in the section 271 infringement analysis, the court hereby finds and rules that genuine issues of material fact remain to be resolved, and thus plaintiff's motion for summary judgment as to the individual liability of Judd (Count II) must be and herewith is denied.

### 5. Infringement of the '078 Patent

■ Counts I and II of the Consolidated Complaint allege, respectively, that both Judd, by his direction and participation, and Curtis have infringed and are still infringing "Faneuf's '863 patent and/or the '078 patent which belongs to Faneuf." Curtis moves for summary judgment regarding the '078 patent, to which it holds legal title as the assignee of Judd, based on defendants' lack of standing. *See, e.g., Arachnid, Inc. v. Merit Indus., Inc.,* 939 F.2d 1574, 1579 (Fed.Cir.

---

**9.** Moreover, Judd's status as the assignor of the '078 patent does not insulate him from potential infringement liability. *See Rohm & Haas, supra,* 718 F.Supp. at 331–32 (assignor of patents who encouraged and induced assignee activities infringing existing patent can be liable under 35 U.S.C. § 271(b)).

1991) ("general rule is that one seeking to recover money damages for infringement of a United States patent (an action 'at law') must have held the *legal title* to the patent *during the time of the infringement*"); *see also Crown Die & Tool Co. v. Nye Tool & Mach. Works,* 261 U.S. 24, 40–41, 43 S.Ct. 254, 258, 67 L.Ed. 516 (1923); CHISUM, *supra,* § 21.03[2][f] ("The issue in determining standing is whether the claimant possesses legal title ownership of the patent").

Contrary to plaintiffs' contention, *Arachnid* does not control the issue. Plaintiffs misconstrue the germ of defendants' complaint. The record clearly evinces that Faneuf is the legal owner of the '863 patent, and as such is conferred thereby with the authority to protect his property against infringement by recourse to the law. *See* 35 U.S.C. § 281 (patentee shall have remedy by civil action for infringement of his patent). With regard to the '078 patent, defendants do not contest the fact that Curtis, as Judd's assignee, presently holds legal title.

Rather, defendants argue that equitable title to the '078 patent,[10] acquired through the appropriation of design modifications to the '863 patent, is held by Faneuf. As a combined consequence of the equitable title and the malappropriation, defendants seek an assignment of legal title to the '078 patent to Faneuf as the rightful patentee.[11] It is this equitable nature of the remedy sought that renders irrelevant the issue of standing.

The remedy of equitable assignment of a malappropriated patent is not a unique circumstance. *See Becher v. Contoure Labs., Inc.,* 29 F.2d 31 (2d Cir.1928), *aff'd,* 279 U.S. 388, 49 S.Ct. 356, 73 L.Ed. 752 (1929); *Richardson v. Suzuki Motor Co., Ltd.,* 868 F.2d 1226, 1250 (Fed.Cir.), *cert. denied,* 493 U.S. 853, 110 S.Ct. 154, 107 L.Ed.2d 112 (1989) (district courts empowered to redress wrongful appropriation of intellectual property by those subject to the court's jurisdiction).

*Becher* is more closely analogous to the issue at bar than *Arachnid* and thus controls its resolution.

In *Becher,* the proprietor of an invention was making improvements thereto and engaged another to manufacture some of the components. It was agreed that any information obtained during the improvement process was to be kept secret and confidential. *Becher, supra,* 29 F.2d at 31. Despite this understanding, the parts manufacturer took the inventor's ideas and invention, submitted an application based thereon to the Patent and Trademark Office (PTO), falsely indicating himself as the inventor, and was subsequently issued a United States letters patent number. *Id.* at 32.

Recognizing that the mere fact of receiving an idea from another is not a tort, the Second Circuit emphasized that certain ideas "may have been obtained under circumstances which forbid the borrower to make use of it for his own benefit." *Id.* Further, were the invention a trade secret, the inventor would have been empowered to enjoin the appropriator from using the invention for his own benefit and could have compelled him to account for any value obtained based on wrongful use. Such a result "should be equally true when the secret is an invention." *Id.*

When cast in this light, the court found that the inventor's complaint set up no right under the patent laws as ground for a recovery. Rather, the "cause of action is based on equitable principles applicable to any wrongful use of confidential information which [another] had argued to keep secret." *Id.* at 33. Thus, by seeking the assignment of the '078 patent, defendants do not seek any right under the patent laws, but "rely[ ] solely upon common-law and equitable principles to prevent a wrongdoer from profiting by the disclosure of information obtained under circumstances which bound him to keep it se-

---

10. Equitable title has been defined as "the beneficial interest of one person whom equity regards as the real owner, although the legal title is vested in another." BLACK'S LAW DICTIONARY 1486 (6th ed. 1990).

11. Although the practical effect of such a finding may result in the assignment of a void patent, *see Wise v. Hubbard,* 769 F.2d 1, 3 (1st Cir.1985)

(citing *Kennedy v. Hazelton,* 128 U.S. 667, 672, 9 S.Ct. 202, 203, 32 L.Ed. 576 (1888)), the Supreme Court has admonished that "[e]stablishing a fact and giving a specific effect to it by judgment are quite distinct." *Becher v. Contoure Labs., Inc.,* 279 U.S. 388, 391, 49 S.Ct. 356, 357, 73 L.Ed. 752 (1928).

cret, and to account for such profit as he has made by wrongful use of the information." *Id.* at 34.

Although defendants in the case at bar seek damages under the patent laws for infringement of their '863 patent, the relief sought respecting the '078 patent is the above-noted equitable remedy of assignment. Curtis and Plasti–Clip were actively engaged in contractual negotiations whereby Plasti–Clip would design and produce a clip for the "Curtis Clip" document holder. As a part of this relationship, Plasti–Clip submitted several design drawings and proposals for Curtis's review and consideration. Design drawing D–1809, provided to Curtis for approval of the specifications, included the following notice:

*Confidential and Proprietary Information*

This document is the property of Plasti–Clip Corporation, Amherst, N.H., and contains confidential and trade secret information. This information may not be transferred from the custody or control of Plasti–Clip Corporation, except as authorized by Plasti–Clip Corporation, and then only [by] way of loan for limited purposes. It must not be reproduced in whole or part and must be returned to Plasti–Clip Corporation upon request and in all events upon completion of the purpose of the loan. Neither this document nor the information it contains may be used or disclosed to the person not having need for such use or discharge consistent with the purpose of the loan without the prior express written consent of Plasti–Clip Corporation.

Hames Exhibit 33 (attached to Defendants' Motion in Opposition to Summary Judgment).

Based on the evidence presented, the court finds that standing is not at issue with respect to defendants' claim on the '078 patent due to the equitable nature of the relief sought. *See Becher, supra* note 11, 279 U.S. at 391, 49 S.Ct. at 357 (inventor's right was

"independent of and prior to any arising out of the patent law"). Since "it inheres in the principles of equity jurisprudence to obstruct and prevent the enjoyment of the fruits of [ ] fraud," *Becher, supra,* 29 F.2d at 34, the court further finds that a reasonable jury could determine that a confidential relationship existed between the parties and that Curtis and Judd, by their concerted actions, breached that confidence. As equity delights in doing justice, and not by halves, *Innersprings, Inc. v. Joseph Aronauer, Inc.,* 27 F.R.D. 32, 35 (E.D.N.Y.1961), plaintiffs' motion for summary judgment as to the issue of standing is hereby denied.

### 6. *Applicability of RSA 358–A*

#### a. *Scope*

■ New Hampshire Revised Statutes Annotated (RSA) 358–A, entitled Regulation of Business Practices for Consumer Protection (Consumer Protection Act or CPA), evinces a " 'comprehensive statute designed to regulate business practices for consumer protection by making it unlawful for persons engaged in trade or commerce to use various methods of unfair competition and deceptive business practices.' " *Gilmore v. Bradgate Assocs.,* 135 N.H. 234, 238, 604 A.2d 555, 557 (1992) (quoting *Chase v. Dorais,* 122 N.H. 600, 601, 448 A.2d 390, 391 (1982)); *see also Chroniak v. Golden Investment Corp.,* 983 F.2d 1140, 1146 (1st Cir.1993). Despite this recognition by both the New Hampshire Supreme Court and the First Circuit, plaintiffs assert that since their actions are not specifically delineated by section 358–A:2, their act of marketing the allegedly infringing article does not come within the prohibitive scope of the statute.

As the First Circuit has observed, the "current version of section 2 [of the CPA] lists thirteen unfair or deceptive acts or practices, *but the listing is expressly made nonexhaustive.*" *Chroniak, supra,* 983 F.2d at 1146 (emphasis added).[12] Continuing, the

---

12. To the extent that the statute and New Hampshire caselaw provide little insight, consultation with both federal and Massachusetts precedent is encouraged. *See* RSA 358–A:13 (courts should "be guided by the interpretation and construction given Section 5(a)(1) of the Federal Trade

Commission Act (15 U.S.C. 45(a)(1)), by the Federal Trade Commission and the Federal courts"); *see also Chase, supra,* 122 N.H. at 602, 448 A.2d at 391–92 (New Hampshire invited to utilize interpretive comparisons with the "well developed" caselaw construing the analogous Massa-

Circuit limned that "[a] practice is 'unfair' if (1) it is ' "within at least the *penumbra* of some common-law, statutory, *or other established concept of unfairness,* " (2) "it is immoral, unethical, oppressive, or unscrupulous," or (3) "it causes substantial injury to consumers." ' " *Id.* (quoting *Rizzuto v. Joy Mfg. Co.,* 834 F.2d 7, 8 (1st Cir.1987) (quoting *Purity Supreme, Inc. v. Attorney General,* 380 Mass. 762, 407 N.E.2d 297, 301 (1980))). Likewise, " '[a] practice may be "deceptive" ... if it "could reasonably be found to have caused a person to act differently from the way he otherwise would have acted." ' " *Chroniak, supra,* 983 F.2d at 1146 (quoting *Kazmaier v. Wooten,* 761 F.2d 46, 51 (1st Cir.1985) (quoting *Purity Supreme, supra,* 407 N.E.2d at 301)).

When applying these definitions, the court is chastened that " '[w]hether a party has committed an unfair or deceptive act, within the meaning of [the consumer protection act], is a *question of fact.* ' " *Chroniak, supra,* 983 F.2d at 1146 (quoting *Brennan v. Carvel Corp.,* 929 F.2d 801, 813 (1st Cir.1991) (citing *USM Corp. v. Arthur D. Little Sys., Inc.,* 28 Mass.App. 108, 546 N.E.2d 888, 897 (1989) (emphasis added and alteration in original))); *see also Pan American World Airways, Inc. v. United States,* 371 U.S. 296, 306–07, 83 S.Ct. 476, 483, 9 L.Ed.2d 325 (1963) (whether an act is "unfair" as contemplated by the Federal Trade Commission Act is subject to a case-by-case determination). As such, and in light of the expansive embrace contemplated by the Legislature in enacting the CPA, the court finds that a factfinder would not be unwarranted in finding that plaintiffs' conduct fell within the "penumbra" of the CPA, and thus plaintiffs' motion for summary judgment as it pertains to the scope of section 358–A:2 is hereby denied.

*b. Exemptions*

■ In the alternative, plaintiffs allege that the Consumer Protection Act claim

brought against Judd is barred by operation of RSA 358–A:3, IV–a. This section exempts from the CPA those "[t]ransactions entered into more than 2 years prior to the complaint." Styled as such, it is clear that the New Hampshire Legislature sought to delineate a class of actions exempt from the provisions of the statute, rather than create a statute of limitations. *See Zee–Bar, Inc.– N.H. v. Kaplan,* 792 F.Supp. 895, 901 (D.N.H.1992).

Plaintiffs filed their declaratory action on September 8, 1989, seeking a declaration of noninfringement and/or invalidity of the '863 patent. By way of answer, defendants alleged on October 19, 1989, several counterclaims, including a violation of RSA 358–A by *both Curtis and Judd.* Defendants reasserted the RSA 358–A violation in their July 13, 1992, direct action against Judd. By order of this court, the original September 8, 1989, action and the subsequent July 13, 1992, action were consolidated on April 4, 1994. Plaintiffs' contend that the July 13, 1992, action is the relevant pleading insofar as the exemption period of the statute is concerned and since the infringement by Judd alleged therein occurred more than two years prior to the commencement of said action, suit based thereon is barred by operation of law.

■ Plaintiffs, the parties claiming the IV–a exemption, bear the burden of proof in establishing the two-year exemption.[13] RSA 358–A:3, V; *see also McMullin v. Downing,* 135 N.H. 675, 680, 609 A.2d 1226, 1230 (1992). The court, however, decides as a matter of law whether the exemption is applicable. *See McMullin, supra,* 135 N.H. at 680, 609 A.2d at 1230; *see also Gilmore, supra,* 135 N.H. at 239, 604 A.2d at 557.

Since neither the Legislature nor the New Hampshire Supreme Court has specified the precise manner in which a violation of RSA

chusetts "unfair and deceptive practices act," Mass.Gen.Laws. ch. 93A).

**13.** The cases cited by plaintiffs in their brief are inapposite and provide little assistance toward resolution of the issue, since all involved a delay of greater than two years between the offending incidents and the filing of any complaint or coun-

terclaim. *See, e.g., Zee–Bar, supra,* 792 F.Supp. at 895 (3½ years elapsed); *Lerer v. Ultra Scan, Inc.,* 770 F.Supp. 51 (D.N.H.1990) (3 years elapsed); *City of Manchester v. National Gypsum Co.,* 637 F.Supp. 646 (D.R.I.1986) (8 years elapsed). *But cf. Gilmore v. Bradgate Assoc., Inc.,* No. 89–189–D, slip op. at 5 (D.N.H. July 27, 1990) (17–month lapse insufficient to bar action).

358–A must be pled so as to avoid the section 358–A:3, IV–a, exemption, this court declines to read enhanced pleading requirements into the CPA. *See Zee–Bar, supra,* 792 F.Supp. at 902. Under the present legislative scheme, only transactions entered into "more than 2 years *prior to the complaint*" are entitled to the statutory exemption. RSA 358–A:3, IV–a (emphasis added).

■■■■ The court, therefore, finds and rules that a party may preserve their rights under the CPA whether such violation is alleged in an original complaint or by way of counter-claim. *See, e.g., American Hosp. Supply Corp. v. Roy Lapidus, Inc.,* 493 F.Supp. 1076, 1077 (D.Mass.1980) (counterclaim allegation sufficient to invoke protection of Massachusetts CPA, but claim dismissed due to satisfaction of interstate commerce percentage exemption). The court further finds that the October 19, 1989, answer and counterclaim filed by defendants was statutorily sufficient to avoid operation of the two-year exemption period. Consequently, plaintiffs' motion for summary judgment as to unfair or deceptive trade practices (Count V) must be and herewith is denied.

### 7. The Attempted Monopolization Anti-Trust Claims

Section 2 of the Sherman Act, codified at 15 U.S.C. § 2 (1994), provides,

Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony, . . . .

In the words of the Supreme Court, section 2 "addresses the actions of single firms that monopolize or attempt to monopolize, as well as conspiracies and combinations to monopo-

lize." *Spectrum Sports, Inc. v. McQuillan,* —— U.S. ——, ——, 113 S.Ct. 884, 889, 122 L.Ed.2d 247 (1993). Proof of attempted monopolization requires "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent [14] to monopolize and (3) a dangerous probability of achieving monopoly power." *Id.* at —— ——, 113 S.Ct. at 890–91; *see also George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc.,* 508 F.2d 547, 550 (1st Cir.1974), *cert. denied,* 421 U.S. 1004, 95 S.Ct. 2407, 44 L.Ed.2d 673 (1975).

In their motion for summary judgment, plaintiffs contend that no genuine issues of material fact exist concerning whether Curtis and/or Judd "engaged in predatory or anticompetitive conduct" or whether such "dangerous probability" of monopoly power is imminent, and therefore said motion should be granted. In opposition, defendants principally rely on the allegedly surreptitious application for the '078 patent as well as their inability to depose Judd.

#### a. Anti–Competivie Conduct

■■■■ Monopoly power in violation of section 2 of the Sherman Act is such power that arises as a result of "the willful acquisition or maintenance of [monopoly] power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.,* 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1703–04, 16 L.Ed.2d 778 (1966); *see also Eastman Kodak Co. v. Image Technical Servs., Inc.,* 504 U.S. 451, 479, 112 S.Ct. 2072, 2089, 119 L.Ed.2d 265 (1992). In the First Circuit, such "willful acquisition or maintenance" has been denominated "exclusionary conduct" and defined as "'conduct, *other than competition on the merits* or restraints reasonably "necessary" to competition on the merits, that reasonably appears

---

**14.** Despite the fact that the Supreme Court has noted, in dictum, that summary judgment procedures, especially in complex antitrust actions, should be used cautiously when motive and intent are integral elements of the cause of action, *see Poller v. Columbia Broadcasting Sys., Inc.,* 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962), most courts, including the Supreme Court, are now less hesitant to apply the customary summary judgment standard in antitrust

cases. *See, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The First Circuit "specifically has rejected special summary judgment treatment in antitrust cases, holding that the particular circumstances involved are what control." *Texaco Puerto Rico, Inc. v. Medina,* 834 F.2d 242, 247 (1st Cir.1987) (citing *White v. Hearst Corp.,* 669 F.2d 14, 17 (1st Cir.1982)).

capable of making a significant contribution to creating or maintaining monopoly power.'" *Barry Wright Corp. v. ITT Grinnell Corp.*, 724 F.2d 227, 230 (1st Cir.1983) (quoting 3 PHILIP AREEDA & DONALD TURNER, ANTITRUST LAW § 626, at 83 (1978)) (emphasis added); *see also Clamp–All Corp. v. Cast Iron Soil Pipe Inst.*, 851 F.2d 478, 491 (1st Cir.1988), *cert. denied*, 488 U.S. 1007, 109 S.Ct. 789, 102 L.Ed.2d 780 (1989).

■ To be "anticompetitive," a practice must harm the competitive process rather than merely harm competitors. *R.W. Int'l Corp. v. Welch Food, Inc.*, 13 F.3d 478, 487 (1st Cir.1994); *see also Spectrum Sports, supra*, — U.S. at ——, 113 S.Ct. at 892 ("The law directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself."); *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 767 n. 14, 104 S.Ct. 2731, 2740 n. 14, 81 L.Ed.2d 628 (1984) (" '[T]he antitrust laws ... were enacted for "the protection of *competition*, not *competitors*." ' " (citations omitted)). Harm to this process occurs "when the conduct at issue 'obstructs the achievement of competition's basic goals—lower prices, better products, and more efficient production methods.' " *Picker Int'l, Inc. v. Leavitt*, 865 F.Supp. 951, 961, (D.Mass.1994) (quoting *Town of Concord v. Boston Edison Co.*, 915 F.2d 17, 22 (1st Cir.1990), *cert. denied*, 499 U.S. 931, 111 S.Ct. 1337, 113 L.Ed.2d 268, *and reh'g denied*, 500 U.S. 930, 111 S.Ct. 2047, 114 L.Ed.2d 131 (1991)); *see also J.H. Westerbeke Corp. v. Onan Corp.*, 580 F.Supp. 1173, 1189 (D.Mass.1984) (anticompetitive quality of an act may depend upon the purpose with which it was done).

Congress intended that the economic incentive afforded by the patent laws were to benefit "only those persons who lawfully acquire the rights granted under our patent system." *SCM Corp. v. Xerox Corp.*, 645 F.2d 1195, 1206 (2d Cir.1981), *cert. denied*, 455 U.S. 1016, 102 S.Ct. 1708, 72 L.Ed.2d 132 (1982); *cf., Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965) (fraudulent procurement of patent). "Where ... the acquisition [of the patent] itself is unlawful, the subsequent exercise of the ordinarily lawful exclusionary power inherent in the patent would be a continuing wrong, a continuing unlawful exclusion of potential competitors." *SCM Corp., supra*, 645 F.2d at 1206.

■ The purpose of the Sherman Act "is not to protect businesses from the working of the market; it is to protect the public from the failure of the market.... It does so not out of solicitude for private concerns but out of concern for the public interest." *Spectrum Sports, supra*, — U.S. at ——–——, 113 S.Ct. at 891–92. Plaintiffs, attempting to limit the harm to mere competitors rather than to competition itself, comment, "the only actions alleged by Plasti–Clip to support its [Sherman Act] claim are that Curtis and Mr. Judd obtained the '078 Patent improperly and that Curtis since has manufactured and sold document holders that are within the scope of the '078 Patent."[15] Motion to Dismiss or for Summary Judgment of Curtis Manufacturing Company, Inc., and Thomas W. Judd (Plaintiffs' Motion for Summary Judgment) at 26. However, if the patent was wrongfully obtained, plaintiffs will have likewise wrongfully acquired the power of exclusion and deprived Faneuf of the license power he would ordinarily hold as the true inventor.

If Faneuf held the patent, it would be within his rights to license the superior clip to other entities in the computer peripheral market. Stripped of this power by Curtis's and Judd's allegedly fraudulent acts, Curtis can effectively keep other market partici-

---

15. The court notes here in passing that "[a] patent by its very nature is affected with a public interest.... [It] is an exception to the general rule against monopolies and to the right to access to a free and open market. The far-reaching social and economic consequences of a patent, therefore, give the public a paramount interest in seeing that patent monopolies spring from backgrounds free from fraud or other inequitable conduct and that such monopolies are kept within their legitimate scope." *Walker Process, supra*, 382 U.S. at 177, 86 S.Ct. at 350 (quoting *Precision Instrument Mfg. Co. v. Automotive Maintenance Mach. Co.*, 324 U.S. 806, 816, 65 S.Ct. 993, 998, 89 L.Ed. 1381 (1945)).

pants from using their clip. The evidence indicates that such exclusion has already occurred in at least one instance. The court therefore finds that a genuine issue exists as to whether plaintiffs have engaged in anti-competitive conduct.

### b. *Specific Intent*

▮▮▮▮▮ Liability for attempted monopolization must also be predicated upon proof of specific intent to monopolize. *Spectrum Sports, supra,* —— U.S. at ——, 113 S.Ct. at 892. Specific intent to obtain a monopoly includes an intent to unreasonably restrict competition. *See, e.g., Onan Corp., supra,* 580 F.Supp. at 1190. The First Circuit has recognized that "a specific intent to monopolize or restrain competition can often be inferred from a finding of bad faith." *CVD, Inc. v. Raytheon Co.,* 769 F.2d 842, 851 (1st Cir.1985), *cert. denied,* 475 U.S. 1016, 106 S.Ct. 1198, 89 L.Ed.2d 312 (1986).

"In antitrust cases, questions of motive, or intent, credibility, or conspiracy frequently prevent summary judgment from being entered, since these issues involve subjective questions regarding state of mind that can only be decided after a full trial." 10A CHARLES A. WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2732.1, at 313–19 (1983). This court has previously recognized that the determination of specific intent is itself a question of fact, not law. *Varney v. Coleman Co., Inc.,* 385 F.Supp. 1337, 1343 (D.N.H.1974). As a question of fact, such an inquiry is within the exclusive province of the jury.

▮▮▮▮ The inability of the parties to schedule Judd's deposition necessarily leaves genuine issues regarding specific intent unresolved and summary judgment particularly inappropriate. This is so

> [s]ince the information relating to state of mind generally is within the exclusive knowledge of one of the litigants and can be evaluated only on the basis of circumstantial evidence, the other parties normally should have an opportunity to engage in discovery before a summary judgment is

rendered. But even this may not be enough. Inasmuch as a determination of someone's state of mind usually entails the drawing of factual inferences as to which reasonable men might differ—a function traditionally left to the jury—summary judgment often will be an inappropriate means of resolving an issue of this character.

WRIGHT, *supra,* § 2730, at 238; *see also Nash v. Keene Publishing Corp.,* 127 N.H. 214, 224, 498 A.2d 348, 354–55 (1985) (issue of intent in libel action inappropriate for resolution at summary judgment). The court therefore finds genuine issues with respect to the specific intent element of the Sherman Act claim.

### c. *Dangerous Probability*

▮▮▮▮ To withstand plaintiffs' motion for summary judgment on the attempted monopolization claim, defendants must further demonstrate, beyond mere facial averments, that genuine issues exist concerning the probability of plaintiffs' attaining monopoly power. *See Spectrum Sports, supra,* —— U.S. at ——, 113 S.Ct. at 891. "After all, an act can be wrongful in the context of section 2 [of the Sherman Act] only where it has or threatens to have a significant exclusionary impact." *U.S. Healthcare, Inc. v. Healthsource, Inc.,* 986 F.2d 589, 597–98 (1st Cir.1993).

▮▮▮▮▮ To determine exclusionary impact, the court must first determine the relevant market.[16] Put simply, the relevant market is composed of (1) the product market and (2) the geographic area involved. *See Lee v. Life Ins. Co. of North America,* 829 F.Supp. 529, 539 (D.R.I.1993), *aff'd* 23 F.3d 14 (1st Cir.1994); *see also United States v. E.I. du Pont de Nemours & Co.,* 351 U.S. 377, 404, 76 S.Ct. 994, 1012, 100 L.Ed. 1264 (1956); *Brown Shoe Co. v. United States,* 370 U.S. 294, 324, 82 S.Ct. 1502, 1523, 8 L.Ed.2d 510 (1962). "The relevant product market generally consists 'of products that have reasonable interchangeability for the purposes for which they are produced,' taking into consideration price, use and quality." *Lee, supra,* 829 F.Supp. at 539 (quoting *E.I. du*

---

16. "Because market power is often inferred from market share, market definition generally deter-mines the result of the case." *Kodak, supra,* 504 U.S. at 469 n. 15, 112 S.Ct. at 2083 n. 15.

**1232**

*Pont, supra,* 351 U.S. at 404, 76 S.Ct. at 1012). Moreover, "[t]he extent to which one market prevents exploitation of another market depends on the extent to which consumers will change their consumption of one product in response to a price change in another; *i.e.,* the 'cross-elasticity of demand.'" *Kodak, supra,* 504 U.S. at 469, 112 S.Ct. at 2083.

Defendants allege that the relevant product market is comprised of "all document holders for use as a computer peripheral," Consolidated Complaint ¶ 49, and plaintiffs assume arguendo this definition. Plaintiffs' Motion for Summary Judgment at 26. For the purposes of this motion, the court takes the evidence in the light most favorable to the nonmovant and as such finds that defendants have properly characterized the relevant market for the disputed clip.[17] The relevant geographic market at issue, as conceded by plaintiffs, is the entire United States. Plaintiffs' Motion for Summary Judgment at 25.

In response to interrogatories propounded by defendants regarding the size of the market and Curtis's market share, plaintiffs provided sales figures for the past four years, the current year (1994) to date, and projected sales figures for the remainder of 1994. Included in this information was the following handwritten note: "have 15% of world mkt (educated guess)." No evidence has been submitted by any of the parties regarding Curtis's share of the United States market for computer peripheral document holders. Since a United States Letters Patent only protects inventors from infringing articles marketed in the United States, *see Deepsouth Packing Co. v. Laitram Corp.,* 406 U.S. 518, 530, 92 S.Ct. 1700, 1708, 32 L.Ed.2d 273, *reh'g denied,* 409 U.S. 902, 93 S.Ct. 94, 34 L.Ed.2d 165 (1972) ("our patent system makes no claim to extraterritorial effect"), the dearth of evidence on this point places the court in a decisional bind.

Summary judgment, as previously noted, is a procedural device used "'to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required.'" *Snow v. Harnischfeger Corp.,* 12 F.3d 1154, 1157 (1st Cir.1993) (quoting *Wynne v. Tufts Univ. Sch. of Medicine,* 976 F.2d 791, 794 (1st Cir. 1992)). Although defendants have put forward enough evidence to sustain their attempted monopolization antitrust claims with respect to the "anticompetitive conduct" and "specific intent" prongs, the record before the court is completely devoid of any evidence pertaining to the market power of Curtis *in the United States.* As such, the court is unable to determine the final aspect of an attempted monopolization claim—"dangerous probability of success."[18]

---

**17.** The First Circuit has previously commented on the market definition quandary, noting that

> [t]here is no subject in antitrust law more confusing than market definition. One reason is that the concept, even in the pristine formulation of economists, is deliberately an attempt to oversimplify—for working purposes—the very complex economic interactions between a number of differently situated buyers and sellers, each of whom in reality has different costs, needs, and substitutes. *See United States v. E.I. du Pont de Nemours & Co.,* 351 U.S. 377 [76 S.Ct. 994, 100 L.Ed. 1264] (1956). Further, when lawyers and judges take hold of the concept, they impose on it nuances and formulas that reflect administrative and antitrust policy goals. This adaption is legitimate (economists have no patent on the concept), but it means that normative and descriptive ideas become intertwined in the process of market definition.

*U.S. Healthcare, supra,* 986 F.2d at 598. Given the ultimate disposition of the antitrust inquiry, the court is satisfied with defendants' asserted market definition.

**18.** Based on the facts and circumstances presently before the court, unless defendants can demonstrate that Curtis held 50 percent or more of the United States domestic market, their antitrust claims will fail as a matter of law. *See, e.g., Advanced Health–Care Servs. v. Giles Memorial Hosp.,* 846 F.Supp. 488, 497 (W.D.Va.1994) ("Where, as in this case, evidence of intent and predatory conduct is weak and entry barriers are low, the plaintiff must show a market share above 50 percent to show a 'dangerous probability of success.'"); *M & M Medical Supplies & Serv., Inc. v. Pleasant Valley Hosp., Inc.,* 981 F.2d 160, 168 (4th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 2962, 125 L.Ed.2d 662 (1993) (claims involving less than a 50 percent market share should usually be rejected, "except where conduct is very likely to achieve monopoly or where conduct is invidious"); *Barr Labs., Inc. v. Abbott Labs.,* 978 F.2d 98, 112–15 (3d Cir.1992) (defendant's 50 percent market share insufficient to show dangerous probability of success).

As the party pressing the attempted monopolization claim, defendants "must plead facts sketching 'relevant details of a § 2 claim' including 'facts defining the market.'" *C.R. Bard, Inc. v. Medical Electronics Corp.*, 529 F.Supp. 1382, 1390 (D.Mass.1982) (quoting *Gilbuilt Homes, Inc. v. Continental Homes of New England*, 667 F.2d 209, 211 (1st Cir.1981)). The court appreciates, however, that discovery has been primarily hampered by numerous unsuccessful efforts to depose Judd, the person identified by Curtis as "the most knowledgeable employee of Curtis regarding sales of the [document holders]." Letter of Attorney Pirozzolo to Attorney Danenbarger dated Jan. 18, 1994 (attached as Exhibit J to Defendants' Motion in Opposition to Summary Judgment).

Due to the important nature of this testimony, the court will defer its summary judgment ruling on the antitrust claim until the deposition of Judd has occurred.[19] *See Phillips v. Martin Marietta Corp.*, 400 U.S. 542, 544, 91 S.Ct. 496, 498, 27 L.Ed.2d 613 (1971) (grant of summary judgment reversed and case remanded for further development on ground of inadequate record for summary judgment). The parties have until December 21, 1994, to depose Judd and file supplemental briefs on the narrow issue of antitrust liability.

### 8. Conversion and Idea Misappropriation

■ In the Consolidated Complaint, defendants also allege that plaintiffs converted the design of the plastic clip device and thereafter submitted said design to the PTO as part of the application which ultimately resulted in the '078 Patent. Plaintiffs contend that the design of the clip is merely an idea, and as such cannot be the subject of an action for conversion. In view of the present record, as well as New Hampshire and First Circuit precedent, the court finds plaintiffs' argument unpersuasive.[20]

It has become settled law in New Hampshire that "'[c]onversion is an intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel.'" *LFC Leasing & Fin. Corp. v. Ashuelot Nat'l Bank*, 120 N.H. 638, 640, 419 A.2d 1120, 1121 (1980) (quoting *Muzzy v. Rockingham County Trust Co.*, 113 N.H. 520, 523, 309 A.2d 893, 894 (1973)); *see also* RESTATEMENT (SECOND) OF TORTS § 222A(a) (1965).

Chattels subject to conversion can be classified as either tangibles or intangibles. With respect to intangible chattels, the RESTATEMENT provides:

(1) Where there is conversion of a document in which intangible rights are merged, the damages include the value of such rights.

(2) One who effectively prevents the exercise of intangible rights of the kind customarily merged in a document is subject to a liability similar to that for conversion, even though the document is not itself converted.

RESTATEMENT, *supra*, § 242; *see also Triple-A Baseball Club Ass'n v. Northeastern Baseball, Inc.*, 655 F.Supp. 513, 539 (D.Me.), *rev'd on other grounds*, 832 F.2d 214 (1st Cir. 1987), *cert. denied*, 485 U.S. 935, 108 S.Ct. 1111, 99 L.Ed.2d 272 (1988) (citing § 242 and noting Maine's recognition that intangible rights may be converted). "Under such circumstances, the document may be the subject of conversion as the embodiment of and as representing the title to the chattel or the

---

**19.** In the complaint, defendants asserted antitrust violations under both federal and state law. To the extent that the New Hampshire Legislature has encouraged the uniform construction of RSA 356 (Combinations & Monopolies) with federal antitrust law, any determination of liability under the state statute is likewise deferred. *See* RSA 356:14; *U.S. Healthcare, supra*, 986 F.2d at 599.

**20.** Plaintiffs further alleged that defendants' claims of conversion were preempted by operation of 35 U.S.C. §§ 116 (Inventors) and 256 (Correction of named inventor). This federal scheme for the correction of patents only applies when a joint inventor has not been named in the application *through error* which arises *without any deceptive intention* on the part of the named inventor. *See* 35 U.S.C. §§ 116, 256. Since the record clearly indicates that such error was not due to mere inadvertence, the court finds said sections of title 35 to be inapplicable in the present dispute.

obligation." RESTATEMENT, *supra,* § 242 cmt. a.[21]

Put differently,

> [w]here information is gathered and arranged at some cost and sold as a commodity on the market, it is properly protected as property. *Where ideas are formulated with labor and inventive genius, as in the case of literary works or scientific researches, they are protected.* Where they constitute instruments of fair and effective commercial competition, those who develop them may gather their fruits under the protection of the law.

*Pearson v. Dodd,* 410 F.2d 701, 707–08 (D.C.Cir.), *cert. denied,* 395 U.S. 947, 89 S.Ct. 2021, 23 L.Ed.2d 465 (1969) (emphasis added and footnotes omitted).[22]

As discussed above in part 5, *supra,* regarding defendants' standing to sue for infringement, defendants had a proprietary interest in design drawing D–1809. *See* Hames Exhibit 33, *supra.* Although the resultant clips were to be marketed by Curtis, neither the idea embodied in the design drawing nor the molds used to produce the clips were to leave Plasti–Clip's exclusive control. *See* Hames Exhibit 33, *supra* (proprietary disclaimer of drawing); *see also* Hames Exhibit 30 (propriety disclaimer of molds) (attached to Defendants' Motion in Opposition to Summary Judgment); Deposition of Hames at 137 (" 'Charges for molds and tools only cover a portion of the cost. Title and possession of molds and tools remain with Plasti–Clip.' That's something we would never agree to *if that was caught* . . . I know it's after the fact. . . ." (emphasis added)). The court therefore finds that since

the ideas embodied in design drawing D–1809 were formulated through defendants' "labor and inventive genius," *Pearson, supra,* 410 F.2d at 707–08, defendants thus had a right to the "possession" of their property, both tangible and intangible. *See, e.g., Quincy Cablesystems, Inc. v. Sully's Bar, Inc.,* 650 F.Supp. 838, 848 (D.Mass.1986) (plaintiff had rights to "possession" of satellite transmissions); *Wise, supra* note 11, 769 F.2d at 2 (claims of conversion and misappropriation against fraudulent inventor permissible but denied due to expiration of limitations period).

Moreover, despite plaintiffs' assertion that Judd's assignment of the patent to Curtis relieves him of conversion liability, the court further finds that, on the evidence before it, Judd's participation in the '078 patent application scheme serves as a sufficient predicate for the imposition of personal liability. *See Mottolo, supra,* 629 F.Supp. at 60 (personal participation standard for corporate officer liability).

In light of these findings, therefore, plaintiffs' motion for summary judgment as to conversion and idea misappropriation (Count VI) must be and herewith is denied.

### Conclusion

For the reasons set forth herein, plaintiffs' motion to dismiss or for summary judgment (document 57) is denied in all respects with the exception of the antitrust claims brought against both Curtis and Judd (Count IV). The parties shall have until December 21, 1994, to obtain Judd's deposition and file supplemental briefs with the court on the

---

21. The court pauses here to note that although plaintiffs are correct in their assertion that conversion of an intangible right has been applied to the conversion of bank books, bonds, checks, and the like, "[s]uch documents do not constitute an all-inclusive catalogue of those to which the rule stated in [ ] Section [242] is applicable. . . . The law is evidently undergoing a process of expansion, the ultimate limits of which cannot as yet be determined." RESTATEMENT, *supra,* § 242 cmt. b.

22. At least one court has indicated that the inquiry should focus "on what proof is necessary to

establish the existence of the allegedly converted property; not the form it has taken or its identification within a larger quantity of identical property." *Northcraft v. Edward C. Michener Assocs., Inc.,* 319 Pa.Super. 432, 466 A.2d 620, 625 (1983) (holding that cause of action exists for wrongfully retained plans and specifications, but suggested that more amenable cause of action would lie for breach of contract or misrepresentation). *See also* 7 STUART M. SPEISER, ET AL., THE AMERICAN LAW OF TORTS § 24:5, at 715 (1990) (noting paucity of authority on subject).

narrow issue of antitrust liability as set out in Count IV of the Consolidated Complaint.

SO ORDERED.